# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

November 26, 2019

Lyle W. Cayce
Clerk

No. 17-20793

_____

In re:   ULTRA PETROLEUM CORPORATION; KEYSTONE GAS GATHERING, L.L.C.; ULTRA RESOURCES, INCORPORATED; ULTRA WYOMING, INCORPORATED; ULTRA WYOMING LGS, INCORPORATED; UP ENERGY CORPORATION; UPL PINEDALE, L.L.C.; UPL THREE RIVERS HOLDINGS, L.L.C.,

            Debtors,

ULTRA PETROLEUM CORPORATION; KEYSTONE GAS GATHERING, L.L.C.; ULTRA RESOURCES, INCORPORATED; ULTRA WYOMING, INCORPORATED; ULTRA WYOMING LGS, INCORPORATED; UP ENERGY CORPORATION; UPL PINEDALE, L.L.C.; UPL THREE RIVERS HOLDINGS, L.L.C.,

            Appellants,

v.

AD HOC COMMITTEE OF UNSECURED CREDITORS OF ULTRA RESOURCES, INCORPORATED; OPCO NOTEHOLDERS,

            Appellees.

_____

Appeal from the United States Bankruptcy Court
for the Southern District of Texas

_____

ON PETITION FOR REHEARING

Before DAVIS, ENGELHARDT, and OLDHAM, Circuit Judges.

ANDREW S. OLDHAM, Circuit Judge:

No. 17-20793

Treating the Appellees' and Intervenors' Joint Petition for Rehearing En Banc as a Petition for Panel Rehearing, it is GRANTED. The prior opinion, *In re Ultra Petroleum Corporation*, 913 F.3d 533 (5th Cir. 2019), is withdrawn, and the following opinion is substituted:

These bankruptcy proceedings arise from exceedingly anomalous facts. The debtors entered bankruptcy insolvent and now are solvent. That alone makes them rare. But second, the debtors accomplished their unlikely feat by virtue of a lottery-like rise in commodity prices. The combination of these anomalies makes these debtors as rare as the proverbial rich man who manages to enter the Kingdom of Heaven.

The key legal question before us is whether the rich man's creditors are "impaired" by a plan that paid them everything allowed by the Bankruptcy Code. The bankruptcy court said yes. In that court's view, a plan impairs a creditor if it refuses to pay an amount the Bankruptcy Code independently disallows. In reaching that conclusion, the bankruptcy court split from the only court of appeals to address the question, every reported bankruptcy court decision on the question, and the leading treatise discussing the question. We reverse and follow the monolithic mountain of authority holding the Code—not the reorganization plan—defines and limits the claim in these circumstances.

Because the bankruptcy court saw things differently, it did not consider whether the Code disallows certain creditors' contractual claims for a Make-Whole Amount or post-petition interest. Instead, it ordered the debtors to pay both amounts in full. We vacate and remand those determinations for reconsideration.

I.

Ultra Petroleum Corporation ("Petroleum") is an oil and gas exploration and production company. To be more precise, it's a holding company. Petroleum's subsidiaries—UP Energy Corporation ("Energy") and Ultra

No. 17-20793

Resources, Inc. ("Resources")—do the exploring and producing. Resources took on debt to finance its operations. Between 2008 and 2010, Resources issued unsecured notes worth $1.46 billion to various noteholders. And in 2011, it borrowed another $999 million under a Revolving Credit Facility. Petroleum and Energy guaranteed both debt obligations.

In 2014, crude oil cost well over $100 per barrel. But then Petroleum's fate took a sharp turn for the worse. Only a year and a half later, a barrel cost less than $30. The world was flooded with oil; Petroleum and its subsidiaries were flooded with debt. On April 29, 2016, the companies voluntarily petitioned for reorganization under Chapter 11. *See* 11 U.S.C. § 301(a). No one argues the companies filed those petitions in bad faith. *See id.* § 1112(b).

During bankruptcy proceedings, however, oil prices rose. Crude oil approached $80 per barrel, and the Petroleum companies became solvent again. So, the debtors proposed a rare creature in bankruptcy—a reorganization plan that (they said) would compensate the creditors in full. As to creditors with claims under the Note Agreement and Revolving Credit Facility (together, the "Class 4 Creditors"), the debtors would pay three sums: the outstanding principal on those obligations, pre-petition interest at a rate of 0.1%, and post-petition interest at the federal judgment rate. *In re Ultra Petroleum Corp.*, No. 4:16-bk-32202, ECF No. 1308-1 at 25–26 (Bankr. S.D. Tex. 2017). Accordingly, the debtors elected to treat the Class 4 Creditors as "unimpaired." Therefore, they could not object to the plan. 11 U.S.C. § 1126(f).

The Class 4 Creditors objected just the same. They insisted their claims *were* impaired because the plan did not require the debtors to pay a contractual Make-Whole Amount and additional post-petition interest at contractual default rates.

Under the Note Agreement, prepayment of the notes triggers the Make-Whole Amount. That amount is designed "to provide compensation for the

3

deprivation of" a noteholder's "right to maintain its investment in the Notes free from repayment." A formula defines the Make-Whole Amount as the amount by which "the Discounted Value of the Remaining Scheduled Payments with respect to the Called Principal" exceeds the notes' "Called Principal." Remaining scheduled payments include "all payments of [the] Called Principal and interest . . . that would be due" after prepayment (if the notes had never been prepaid). And the discounted value of those payments is keyed to a "Reinvestment Yield" of 0.5% over the total anticipated return on comparable U.S. Treasury obligations.

Under the Note Agreement, petitioning for bankruptcy automatically renders the outstanding principal, any accrued interest, and the Make-Whole Amount "immediately due and payable." Failure to pay immediately triggers interest at a default rate of either 2% above the normal rate set for the note at issue or 2% above J.P. Morgan's publicly announced prime rate, whichever is greater.

The Revolving Credit Facility does not contain a make-whole provision. But it does contain a similar acceleration clause that made the outstanding principal and any accrued interest "automatically . . . due and payable" as soon as Resources petitioned for bankruptcy. And it likewise provides for interest at a contractual default rate—2% above "the rate otherwise applicable to [the] Loan"—if Resources delayed paying the accelerated amount.

Under these two agreements, the creditors argued the debtors owed them an additional $387 million—$201 million as the Make-Whole Amount and $186 million[1] in post-petition interest. Both sides chose to kick the can

---

[1] This amount includes $106 million in interest on the outstanding principal under the notes, $14 million in interest on the Make-Whole Amount, and $66 million in interest on the outstanding principal under the Revolving Credit Facility, all accruing after the debtors filed their petitions.

down the road. Rather than force resolution of the impairment issue at the plan-confirmation stage, the parties stipulated the bankruptcy court could resolve the dispute by deeming the creditors unimpaired and confirming the proposed plan. Meanwhile, the debtors would set aside $400 million to compensate the Class 4 Creditors if necessary "to render [the creditors] Unimpaired." The bankruptcy court agreed and confirmed the plan.

After confirmation, the parties (and the bankruptcy court) turned back to the question of impairment. The debtors acknowledged the plan did not pay the Make-Whole Amount or provide post-petition interest at the contractual default rates. But they insisted the Class 4 Creditors were not "impaired" because federal (and state) law barred them from recovering the Make-Whole Amount and entitled them to receive post-petition interest only at the federal judgment rate.

The Bankruptcy Code provides that a class of claims is not impaired if "the [reorganization] plan . . . leaves unaltered the legal, equitable, and contractual rights to which such claim . . . entitles the holder." 11 U.S.C. § 1124(1). Elsewhere the Code states that a court should disallow a claim "to the extent that [it seeks] unmatured interest." *Id.* § 502(b)(2). The debtors argued the Make-Whole Amount qualified as unmatured interest. But even if it didn't, they said, it was an unenforceable liquidated damages provision under New York law. In either case, something *other than* the reorganization plan itself—the Bankruptcy Code or New York contract law—prevented the Class 4 Creditors from recovering the disputed amounts.

The debtors' argument as to post-petition interest was much the same: The Bankruptcy Code entitles creditors, at most, to post-petition interest at the "legal rate," not the rates set by contract. 11 U.S.C. § 726(a)(5). And the legal rate, they said, is the federal judgment rate under 28 U.S.C. § 1961. Once again, the Code—not the plan—limited the Class 4 Creditors' claims.

5

No. 17-20793

The bankruptcy court rejected the premise that it must bake in the Code's provisions before asking whether a claim is impaired. Instead it concluded unimpairment "requires that [creditors] receive all that they are entitled to under state law." *In re Ultra Petroleum Corp.*, 575 B.R. 361, 372 (Bankr. S.D. Tex. 2017). In other words, if a plan does not provide the creditor with all it would receive under state law, the creditor is impaired even if the Code disallows something state law would otherwise provide outside of bankruptcy. So, the bankruptcy court asked only whether New York law permits the Class 4 Creditors to recover the Make-Whole Amount (concluding it does), and whether the Code limits the contractual post-petition interest rates (concluding it does not). *Id.* at 368–75. It never decided whether the Code disallows the Make-Whole Amount as "unmatured interest" under § 502(b)(2) or what § 726(a)(5)'s "legal rate" of interest means. It ordered the debtors to pay the Make-Whole Amount and post-petition interest at the contractual rates to make the Class 4 Creditors truly unimpaired.

The debtors sought a direct appeal to this Court (rather than the district court) because the case raises important and unsettled questions of law. *See* 28 U.S.C. § 158(d)(2)(A). The bankruptcy court agreed, and so did we. *In re Ultra Petroleum Corp.*, No. 16-32202, 2017 WL 4863015, at *1 (Bankr. S.D. Tex. Oct. 26, 2017). On appeal, we review those legal questions anew. *In re Positive Health Mgmt.*, 769 F.3d 899, 903 (5th Cir. 2014).

II.

We consider first whether a creditor is "impaired" by a reorganization plan simply because it incorporates the Code's disallowance provisions. We think not.

A.

Chapter 11 lays out a framework for proposing and confirming a reorganization plan. Confirmation of the plan "discharges the debtor from any

6

debt that arose before the date of such confirmation."  11 U.S.C. § 1141(d)(1).
Because discharge affects a creditor's rights, the Code generally requires a
debtor to vie for the creditor's vote first.  *Id.* § 1129(a)(8).  And when it does,
the creditor may vote to accept or reject the plan.  *Id.* § 1126(a).  But the
creditor's right to vote disappears when the plan doesn't actually affect his
rights.  If the creditor is "not impaired under [the] plan," he is "conclusively
presumed to have accepted" it.  *Id.* § 1126(f).  The question, then, is whether
the Class 4 Creditors were "impaired" by the plan.

Let's start with the statutory text.  Section 1124(1) says "a class of claims
or interests" is not impaired if "the plan . . . leaves unaltered the [claimant's]
legal, equitable, and contractual rights."  The Class 4 Creditors spill ample ink
arguing their rights have been altered.  But that's both undisputed and
insufficient.  The plain text of § 1124(1) requires that "the plan" do the altering.
We therefore hold a creditor is impaired under § 1124(1) only if "*the plan*" itself
alters a claimant's "legal, equitable, [or] contractual rights."

The only court of appeals to address the question took the same
approach.  In *In re PPI Enterprises (U.S.), Inc.*, a landlord (creditor) argued the
reorganization plan of his former tenant (debtor) impaired his claim because it
did not pay him the full $4.7 million of rent he was owed over the life of the
lease.  324 F.3d 197, 201–02 (3d Cir. 2003).  The Third Circuit disagreed.
Because the Bankruptcy Code caps lease-termination damages under
§ 502(b)(6), the plan merely reflected the *Code's* disallowance.  *Id.* at 204.  At
the end of the day, "a creditor's claim outside of bankruptcy is not the relevant
barometer for impairment; we must examine whether the plan itself is a source
of limitation on a creditor's legal, equitable, or contractual rights."  *Ibid.*  It
simply did not matter the landlord "might have received considerably more if
he had recovered on his leasehold claims before [the debtor] filed for

No. 17-20793

bankruptcy." *Id.* at 205. The debtor's plan gave the landlord everything the law entitled him to once bankruptcy began, so he was unimpaired.

Decisions from bankruptcy courts across the country all run in the same direction. *See, e.g.*, *In re Tree of Life Church*, 522 B.R. 849, 861–62 (Bankr. D.S.C. 2015); *In re RAMZ Real Estate Co.*, 510 B.R. 712, 717 (Bankr. S.D.N.Y. 2014); *In re K Lunde, LLC*, 513 B.R. 587, 595–96 (Bankr. D. Colo. 2014); *In re Mirant Corp.*, No. 03-46590, 2005 WL 6440372, at *3 (Bankr. N.D. Tex. May 24, 2005); *In re Coram Healthcare Corp.*, 315 B.R. 321, 351 (Bankr. D. Del. 2004); *In re Monclova Care Ctr., Inc.*, 254 B.R. 167, 177 (Bankr. N.D. Ohio 2000), *rev'd on other grounds*, 266 B.R. 792 (N.D. Ohio 2001); *In re Am. Solar King Corp.*, 90 B.R. 808, 819–22 (Bankr. W.D. Tex. 1988). All agree that "[i]mpairment results from what the *plan* does, not what the [bankruptcy] statute does." *Solar King*, 90 B.R. at 819.

The creditors cannot point to a single decision that suggests otherwise. That's presumably why Collier's treatise states the point in unequivocal terms: "Alteration of Rights by the Code Is Not Impairment under Section 1124(1)." 7 COLLIER ON BANKRUPTCY ¶ 1124.03[6] (16th ed. 2018). "We are always chary to create a circuit split." *United States v. Graves*, 908 F.3d 137, 142 (5th Cir. 2018) (quotation omitted). That's especially true "in the context of bankruptcy, where uniformity is sufficiently important that our Constitution authorizes Congress to establish 'uniform laws on the subject of bankruptcies throughout the United States.'" *In re Marciano*, 708 F.3d 1123, 1135 (9th Cir. 2013) (Ikuta, J., dissenting) (quoting U.S. CONST. art. I, § 8, cl. 4). We refuse to create one today.

B.

The Class 4 Creditors' counterarguments do not move the needle. First, they focus on § 1124(1)'s use of the word "claim." They note the Code elsewhere speaks of "*allowed* claims." *See, e.g.*, 11 U.S.C. §§ 506(a)(1), 506(a)(2), 510(c)(1),

1126(c). Then they suggest the absence of "allowed" in § 1124(1) means "claim" there refers to the claim *before* the Code's disallowance provisions come in and trim its edges.

But the broader statutory context cuts the other way. Section 1124 is not just (or even primarily) about the allowance of claims. It is about rights—the "legal, equitable, and contractual rights to which [the] claim . . . entitles the holder." *Id.* § 1124(1). That means we judge impairment after considering everything that defines the scope of the right or entitlement—such as a contract's language or state law. *See In re Energy Future Holdings Corp.*, 540 B.R. 109, 121 (Bankr. D. Del. 2015); 11 U.S.C. § 502(b)(1). Even the bankruptcy court recognized this to some extent because it asked whether New York law permitted the Noteholders to recover the Make-Whole Amount. *See Ultra Petroleum*, 575 B.R. at 368–72. "The Bankruptcy Code itself is a statute which, like other statutes, helps to define the legal rights of persons." *Solar King*, 90 B.R. at 819–20.

Finding no help in § 1124(1)'s statutory text, the Class 4 Creditors turn to the legislative history of a different provision. In 1994, Congress repealed § 1124(3), which provided that a creditor's claim was not impaired if the plan paid "the *allowed amount* of such claim." 11 U.S.C. § 1124(3) (1988) (emphasis added). This proves, they say, that disallowance should now play no role in the impairment analysis.

Even for those who think legislative history can be relevant to statutory interpretation, this particular history is not. It does not say that every disallowance causes impairment. Rather, Congress repealed § 1124(3) in response to a specific bankruptcy court decision. *See In re New Valley Corp.*, 168 B.R. 73 (Bankr. D.N.J. 1994). That decision held unsecured creditors who received their allowed claims from a solvent debtor, but who did not receive post-petition interest, were unimpaired. *Id.* at 77–80. In debating the

9

proposed repeal of § 1124(3), the House Judiciary Committee singled out *New Valley* by name as the justification for the repeal. *See* H.R. Rep. No. 103-835, at 47–48 (1994) (citing *New Valley* and explaining the intent to repeal § 1124(3) "to preclude th[e] unfair result" of "den[ying] the right to receive postpetition interest"). It is noteworthy the committee report does not cite other bankruptcy cases—such as *Solar King*—that addressed Code impairment under § 1124(1). That is why the Third Circuit rejected appellees' legislative-history argument in *PPI* and held the repeal of § 1124(3) "does not reflect a sweeping intent by Congress to give impaired status to creditors more freely outside the postpetition interest context." 324 F.3d at 207 (noting the committee report cited *New Valley* but not *Solar King*).

Next, the Class 4 Creditors attempt to distinguish *PPI*. True, that case involved disallowance under § 502(b)(6), not § 502(b)(2). But that's a distinction without a difference. *See In re W.R. Grace & Co.*, 475 B.R. 34, 161–62 (Bankr. D. Del. 2012); *Energy Future*, 540 B.R. at 122. Section 502 states that "the court . . . *shall allow* [a] claim in [the requested] amount, *except to the extent that*" any one of nine conditions apply. If any of the enumerated conditions applies, the court shall not allow the relevant portion of the claim. *PPI* reasoned that where one of those conditions applies, the Code—not the plan—impairs the creditors' claims. *See* 324 F.3d at 204. That reasoning applies with equal force to § 502(b)(2).

The Class 4 Creditors (like the bankruptcy court) also point to the mechanics of Chapter 11 discharge to suggest the plan itself, not the Code, is doing the impairing. They note the Code's disallowance provisions are carried into effect only if the plan is confirmed, and "confirmation of the plan . . . discharges the debtor from any debt that arose before" confirmation. 11 U.S.C. § 1141(d). In one sense, plan confirmation limits creditors' claims for money by discharging underlying debts. But in another sense, the Code

limits the creditors' claims for money and imposes substantive and procedural requirements for plan confirmation. The Class 4 Creditors' argument thus begs the critical question: What is doing the work here? We agree with *PPI*, every reported decision identified by either party, and Collier's treatise. Where a plan refuses to pay funds disallowed by the Code, the Code—not the plan—is doing the impairing.

## III.

That leaves the questions of whether the Code disallows the creditors' claims for the Make-Whole Amount and the creditors' request for post-petition interest at the contractual default rates specified in the Note Agreement and the Revolving Credit Facility. The creditors say their contracts entitle them to both amounts, and that their contracts should be honored under bankruptcy law's longstanding "solvent-debtor" exception. The debtors argue no such exception exists in modern bankruptcy law. And the debtors further argue both claims are governed by the Bankruptcy Code, not the pre-Code law or the parties' contracts.

The bankruptcy court never reached either question. The issue of make-whole premiums, like the Make-Whole Amount, has become "[a] common dispute" in modern bankruptcy. DOUGLAS G. BAIRD, ELEMENTS OF BANKRUPTCY 84 (6th ed. 2014). Sometimes it is "comparatively easy to tell" whether such premiums are effectively unmatured interest, and therefore disallowed under § 502(b)(2). *Id.* at 84–85. Other times, "it is much harder." *Id.* at 85. Accordingly, "much depends on the dynamics of the individual case." *Ibid.* The bankruptcy court is often best equipped to understand these individual dynamics—at least in the first instance. *Cf. U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Village at Lakeridge, LLC*, 138 S. Ct. 960, 968 n.6 (2018) (noting a bankruptcy court is often best equipped to consider "multifarious, fleeting, special, narrow facts that utterly resist

generalization"). So too is the bankruptcy court best able to consider the post-petition interest question. *See ibid.*

Our review of the record reveals no reason why the solvent-debtor exception could not apply. As other circuits have recognized, "absent compelling equitable considerations, when a debtor is solvent, it is the role of the bankruptcy court to enforce the creditors' contractual rights." *In re Dow Corning Corp.*, 456 F.3d 668, 679 (6th Cir. 2006); *see also In re Chicago, Milwaukee, St. Paul and Pac. R.R. Co.*, 791 F.2d 524, 528 (7th Cir. 1986). That might be the case here.[2] But "mindful that we are a court of review, not of first view," we will not make the choice ourselves or weigh the equities on our own. *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005).

Accordingly, the bankruptcy court should consider the Make-Whole Amount, the appropriate post-petition interest rate, and the applicability of the solvent-debtor exception on remand.

\* \* \*

As we have explained, Code impairment is not the same thing as plan impairment. Because the bankruptcy court found otherwise, it did not address whether the Code disallows the Make-Whole Amount or post-petition interest, and if not, how much the debtors must pay the Class 4 Creditors. The bankruptcy court, therefore, must consider these issues on remand. For that reason and others explained above, we REVERSE in part, VACATE in part, and REMAND for further proceedings consistent with this opinion.

---

[2] Of course, we follow the Supreme Court's command that any "equitable powers [that] remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Law v. Siegel*, 571 U.S. 415, 421 (2014) (quotation omitted). While we express no view on the matter, it is possible a bankruptcy court's equitable power to enforce the solvent-debtor exception is moored in 11 U.S.C. § 1124's command that a "plan leave[] unaltered . . . equitable . . . rights." *See, e.g.*, *In re Energy Holdings*, 540 B.R. 109, 123–24 (Bankr. D. Del. 2015).