# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 14, 2022

Lyle W. Cayce
Clerk

No. 20-20623
CONSOLIDATED WITH
No. 21-20126

---

In Re:  Ultra Petroleum Corporation,

*Debtor*,

Federal Energy Regulatory Commission,

*Appellant*,

*versus*

Ultra Resources, Incorporated,

*Appellee*.

---

Appeal from the United States Bankruptcy Court
for the Southern District of Texas
USBC No. 20-32631

---

Before King, Graves, and Ho, *Circuit Judges*.

King, *Circuit Judge*:

We are asked to determine whether Ultra Resources, Inc.'s rejection of a filed-rate contract in bankruptcy relieves it of its obligation to continue

No. 20-20623
c/w No. 21-20126

performance absent the approval of FERC (the Federal Energy Regulatory Commission). We are also asked to consider whether, under 11 U.S.C. § 1129(a)(6), the bankruptcy court was required to obtain the approval of FERC before confirming Ultra Resources's reorganization plan. We hold that under the particular circumstances presented here, Ultra Resources is not subject to a separate public-law obligation to continue performance of its rejected contract, and that 11 U.S.C. § 1129(a)(6) did not require the bankruptcy court to seek FERC's approval before it confirmed Ultra Resource's reorganization plan. We therefore AFFIRM.

## I.

Ultra Resources, Inc. ("Ultra") is an energy company whose primary business is the production of natural gas. It contracted with Rockies Express Pipeline LLC ("REX") to reserve space on REX's pipeline for Ultra's natural gas. Under the contract, Ultra would pay a monthly reservation charge to reserve a certain amount of space in the pipeline, regardless of how much gas it actually shipped (or even if it ultimately shipped no gas). The contract was made in the shadow of REX's application to FERC to construct a new pipeline, and Ultra was one of the "anchor shippers" whose commitments partially induced REX to construct its pipeline.

The original agreement between Ultra and REX was made in 2008. In 2016, after Ultra failed a creditworthiness check, REX sued for damages in Texas state court and asserted that the contract had been terminated based on Ultra's failure to meet creditworthiness requirements. Ultra then filed for Chapter 11 bankruptcy, and Ultra and REX settled REX's contract claim. Ultra and REX also agreed to a new contract which is the subject of the instant case. The new agreement was slated to run from 2019 until 2026, and reserved space on the REX pipeline for Ultra's natural gas at a rate of $169 million over the life of the agreement—a price Ultra was required to pay

whether or not it used the pipeline. Shortly before this new agreement went into effect, Ultra suspended its drilling program; it later filed again for Chapter 11 bankruptcy. Anticipating the bankruptcy filing, REX had previously petitioned FERC for a declaration that Ultra could not reject the contract between Ultra and REX without FERC's approval; Ultra filed for bankruptcy before FERC issued a decision.

As part of the bankruptcy proceedings, Ultra sought permission from the bankruptcy court to reject its natural gas shipping contract with REX. REX objected and requested that the bankruptcy court refrain from issuing a decision until proceedings could occur before FERC, which would decide whether rejecting the contract was in the public interest, arguing that FERC had exclusive authority to decide whether Ultra should be relieved of its obligations under the filed-rate contract with REX. The bankruptcy court denied that request, but asked FERC to "participate as a party-in-interest in" the bankruptcy proceedings and "comment on whether the rejection of [the contract] would harm the public interest."

FERC responded by filing a motion for reconsideration with the bankruptcy court, arguing that proceedings before FERC were required because FERC could only speak through its orders, occurring after said proceedings, and could not comment on the public interest through counsel in the bankruptcy proceedings. The bankruptcy court denied FERC's motion. Following an evidentiary hearing (which FERC ultimately participated in through counsel), the bankruptcy court authorized Ultra to reject its contract with REX. In its opinion, the bankruptcy court stated that: (1) it had the authority to approve rejection of the contract under our precedent in *In re Mirant Corp.*, 378 F.3d 511 (5th Cir. 2004); (2) even giving the rejection question heightened scrutiny and considering the effect on the public interest, as required under *Mirant*, rejection was still appropriate as it would not harm the supply of natural gas and would significantly benefit

No. 20-20623
c/w No. 21-20126

Ultra's estate; (3) any concerns that rejection would allow Ultra to "free ride" on the pipeline and "still be able to ship natural gas along the REX pipeline, only for substantially less than the cost imposed under [the contract]" were a result of FERC's regulations, not rejection itself, and did not counsel against allowing Ultra to reject the contract; and (4) rejection "neither modif[ied] nor abrogate[d] the [contract]" and therefore did not amount to a rate change requiring approval under 11 U.S.C. § 1129(a). The bankruptcy court also confirmed Ultra's reorganization plan over FERC's objection.

## II.

The question at the heart of this case is one of law and therefore is reviewed de novo. *In re Glenn*, 900 F.3d 187, 189 (5th Cir. 2018). That question concerns a clash of two congressionally constructed titans, FERC and the bankruptcy courts. Congress has imbued each entity with a significant wellspring of authority.

The bankruptcy court's power derives from the Bankruptcy Code. "Congress intended to grant comprehensive jurisdiction to bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995). Specifically, Chapter 11 sets out the framework for restructuring a bankrupt business. *In re Mirant Corp.*, 378 F.3d 511, 517 (5th Cir. 2004). One of the options available to a bankrupt business is the rejection of an executory contract—that is, a contract in which performance remains due on both sides. 11 U.S.C. § 365(a); *Mirant*, 378 F.3d at 518 n.3. Rejection of contracts "is vital to the basic purpose of a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization." *Mirant*, 378 F.3d at 517 (quoting *In re Nat'l Gypsum Co.*, 208 F.3d 498, 504 (5th Cir. 2000)).

No. 20-20623
c/w No. 21-20126

Rejection is subject to the bankruptcy court's approval and is generally considered by the court under the deferential "business judgment" standard. *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019). The rejection of an executory contract is a breach of contract, with "the same effect as a breach outside bankruptcy." *Id.* at 1666. Rejection leaves the counterparty to the contract with "a claim against the estate for damages resulting from the debtor's nonperformance." *Id.* at 1658. Due to the nature of bankruptcy and the insolvency of the debtor, however, this claim is rarely paid in full and the counterparty "may receive only cents on the dollar." *Id.* Additionally relevant to the Chapter 11 reorganization process described herein is 11 U.S.C. § 1129(a)(6), which states that a reorganization plan can be confirmed only if "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."

Next, because "the business of transporting and selling natural gas . . . is affected with a public interest," 15 U.S.C. § 717(a), the Natural Gas Act grants FERC "exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale," *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300–01 (1988). Part of FERC's responsibility is to ensure that all rates charged by natural-gas companies are "just and reasonable." 15 U.S.C. § 717c(a). All rates, even those arising from private contract negotiations, are "filed" with FERC, 15 U.S.C. § 717c(c), and cannot be modified or abrogated absent FERC's approval, *see Mirant*, 378 F.3d at 518.[1]

---

[1] Although *Mirant* considered a power contract regulated by FERC under the Federal Power Act (FPA), the Natural Gas Act is "in all material respects substantially identical." *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 n.7 (1981) (quoting *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 353 (1956)). Courts "therefore follow [the] established

No. 20-20623
c/w No. 21-20126

The requirement that FERC approve any changes to a filed rate applies not only to the parties to the contract, but also to the courts—the "filed rate doctrine" prevents both parties *and* courts from modifying the filed rate contained in a tariff. *Id.* When FERC is considering whether to change a filed rate, it follows the *Mobile-Sierra* doctrine, and will change a rate only if the existing contract "adversely affect[s] the public interest." *Fed. Power Comm'n v. Sierra Pac. Power Co.*, 350 U.S. 348, 355 (1956); *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332, 344–45 (1956). FERC may not modify a filed rate simply because a party finds continued performance unprofitable. *See Mirant*, 378 F.3d at 518.

## III.

It is also important to note that this is not the first time these two titans have clashed. Instead, today's battlefield lies in the shadow of our precedent in *In re Mirant Corp.*, 378 F.3d 511 (5th Cir. 2004). In that case, our court considered "whether a district court may authorize the rejection of an executory contract for the purchase of electricity as part of a bankruptcy reorganization, or whether Congress granted [FERC] exclusive jurisdiction over those contracts." *Mirant*, 378 F.3d at 514. The *Mirant* court answered yes to the question regarding rejection of an executory contract, *id.*, and FERC does not dispute that holding. The question faced by the *Mirant* court arose in a similar context to the instant case. After Mirant filed for Chapter 11 bankruptcy, it sought to reject an electricity-purchase agreement. *Id.* at 515–16. The contract included filed rates that could only be modified by FERC. *Id.* at 515. The bankruptcy court found that it could reject the contract not withstanding FERC's regulatory authority, and additionally enjoined

---

practice of citing interchangeably decisions interpreting the pertinent sections of the two statutes." *Id.*

6

FERC from not only enforcing the specific contract at issue, but also acting in any way to enforce "all of Mirant's wholesale electric contracts" without ten days' notice. *Id.* at 516. The district court then withdrew the reference to the bankruptcy court and found that "the Bankruptcy Code does not provide an exception to FERC's authority . . . and that Mirant must seek relief from the filed rate . . . in a FERC proceeding." *Id.* The district court therefore denied the motion to reject the contract and "vacated the bankruptcy court's injunctive relief because it would interfere with the performance of FERC's regulatory oversight functions." *Id.* at 516–17.

Our court first acknowledged that "FERC has the exclusive authority to determine wholesale rates" and that any attempt to "modify the rates" or "abrogate [the contract]" would have to go through FERC. *Id.* at 519. However, we distinguished the action in the bankruptcy court because "Mirant's *rejection* of the [contract] is a *breach* of that contract" and FERC does not have exclusive authority over a breach of contract claim; "[w]hile the FPA does preempt breach of contract claims that challenge a filed rate, the district courts are permitted to grant relief in situations where the breach of contract claim is based upon another rationale." *Id.* Thus, rejection was allowed since rejection "would only have an indirect effect upon the filed rate" and the "unsecured claim against the bankruptcy estate would be based upon . . . the *filed rate*." *Id.* at 519–20. Rejection therefore was not a challenge to the filed rate that was under the exclusive jurisdiction of FERC. This was so even though part of the reason Mirant sought rejection was that the rate was too high, as Mirant additionally stated "it [did] not need the electricity purchased under the [contract] to fulfill its obligations to supply electricity." *Id.* at 520.

Our court additionally based its holding that rejection of a power contract was allowed on the fact that "[t]he Bankruptcy Code does not . . . include an exception prohibiting rejection of, or providing other

special treatment for, wholesale electric contracts subject to FERC jurisdiction." *Id.* at 521. This lack of an exception signaled a congressional intent to permit rejection since other areas featured "specific limitations on and exceptions to the § 365(a) general rejection authority." *Id.* at 521; *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522–23 (1984) ("Obviously, Congress knew how to draft an exclusion for collective-bargaining agreements when it wanted to; its failure to do so in this instance indicates that Congress intended that § 365(a) apply to all collective-bargaining agreements covered by the NLRA.").

We also rejected FERC's argument that the bankruptcy court needed to ensure that Mirant paid "the full amount of any damages resulting from the breach" because any other result would represent a challenge to the filed rate. *Mirant*, 378 F.3d at 520. We stated that payment of less than the full damages amount would be "entirely dependent upon Mirant's bankrupt status" and the fact that the amount ultimately paid would "depend solely upon the terms applicable to the unsecured creditors as a class under the reorganization plan" and not from the act of "rejection itself." *Id.* at 520–21.

Our court then considered the scope of the district court and bankruptcy court's injunctive power over FERC since "the district court also vacated all of the injunctive relief that the bankruptcy court entered." *Id.* at 522. We stated: "We recognize that some injunctive relief is necessary to bring finality to Mirant's rejection decisions and allow the reorganization process to proceed, but the injunctive relief as previously entered [by the bankruptcy court] was overly broad." *Id.* at 522–23. Our court accepted that a limited injunction was appropriate under 11 U.S.C. § 105(a) because "[t]he concern that the bankruptcy court expressed—that FERC could negate Mirant's rejection of an executory power contract by ordering Mirant to continue performing under the terms of the rejected contract—is certainly a legitimate basis for injunctive relief." *Id.* at 523. However, we also noted that

a bankruptcy court's power under § 105(a) is limited and should be used sparingly; therefore, the bankruptcy court exceeded its authority because it "attempted to accomplish the narrow goal of protecting Mirant's right to reject executory contracts by prohibiting FERC from taking *any* action" against Mirant. *Id.* at 524. Instead, any injunction had to be limited to protecting Mirant from FERC's attempts to compel Mirant to perform under the particular contract that the court enabled Mirant to reject.

We last considered the standard a court should use when deciding whether to approve rejection of a power contract. We stated that "Supreme Court precedent supports applying a more rigorous standard" than the normal business judgment standard. *Id.* In addition, "[u]se of the business judgment standard would be inappropriate in this case because it would not account for the public interest inherent in the transmission and sale of electricity." *Id.* at 525. We thus recommended that the district court or bankruptcy court, on remand, should "carefully scrutinize the impact of rejection upon the public interest and should . . . ensure that rejection does not cause any disruption in the supply of electricity to other public utilities or to consumers." *Id.* We further counseled that the courts should "welcome FERC's participation," which the bankruptcy court had already signaled it would, by "includ[ing] FERC as a party in interest for all purposes." *Id.* at 525–26.

In summary, *Mirant* teaches the following. First, "the power of the [bankruptcy] court to authorize rejection of [a filed-rate contract] does not conflict with the authority given to FERC to regulate rates." *Id.* at 518. Second, and related, rejection "is not a collateral attack upon [the] contract's filed rate because that rate is given full effect when determining the breach of contract damages resulting from the rejection." *Id.* at 522. Third, in ruling on a rejection motion, bankruptcy courts must consider whether rejection

No. 20-20623
c/w No. 21-20126

harms the public interest or disrupts the supply of energy, and must weigh those effects against the contract's burden on the bankrupt estate. *Id.* at 525.

## IV.

In light of *Mirant*, then, what FERC casts as a pitched battle is actually a settled truce. *Mirant* balances the interests of the bankruptcy courts (which are ultimately in charge of the rejection decision) and FERC (by requiring that rejection of a filed-rate contract is considered under a higher standard that considers the public interest and by allowing FERC to participate in the bankruptcy proceedings). As a panel of this court, we are bound by our precedent in *Mirant*, which holds that a bankruptcy court can authorize rejection of a filed-rate contract, and that, post-rejection, FERC cannot require continued performance on the rejected contract. "It is well-established in this circuit that one panel of this Court may not overrule another." *United States v. Segura*, 747 F.3d 323, 328 (5th Cir. 2014) (quoting *Cent. Pines Land Co. v. United States*, 274 F.3d 881, 893 (5th Cir. 2001)). We are not permitted to stray from *Mirant*'s holding even if we were so inclined (which we are not).

As stated earlier, FERC has no quarrel with the proposition that *Mirant* allows a bankruptcy court to approve rejection of a filed-rate contract. FERC, however, argues that any statements in *Mirant* about the consequences of such a rejection (including the statement that FERC could not enforce full performance and payment under a rejected contract) were dicta. However, that portion of the *Mirant* decision was not dicta, and it controls here. We have previously stated that "[a] statement is not dictum if it is necessary to the result or constitutes an explication of the governing rules of law." *Segura*, 747 F.3d at 328 (quoting *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 721 (5th Cir. 2004)). By contrast, "[a] statement is dictum if it could have been deleted without seriously impairing the analytical

10

foundations of the holding and being peripheral, may not have received the full and careful consideration of the court that uttered it." *Id.*

The language in *Mirant* regarding the effects of rejection, and a bankruptcy court's powers if it approves rejection of a filed-rate contract, is the former; that is, it was necessary to our holding in *Mirant*. We can glean so first from the procedural history of *Mirant*. FERC puts great weight on the fact that no filed-rate contract was ever rejected in *Mirant*, and that therefore any commentary on FERC's regulatory authority post-rejection was not essential to *Mirant*'s holding. However, FERC's argument arises from an incomplete recounting of the facts facing us in *Mirant*. When considered in context, the single fact that no contract was ever actually rejected buckles under the weight that this argument asks it to bear.

*Mirant* came to our court after consideration by two separate courts—the bankruptcy court and the district court. The bankruptcy court concluded that "it had the power to enjoin FERC" as well as "the authority to authorize Mirant to reject" the contract. *Mirant*, 378 F.3d at 516. In addition, the bankruptcy court had issued an injunction that prevented FERC from taking any action to compel Mirant to honor not only the contract for which it was seeking rejection, but any of Mirant's wholesale electric contracts. *Id.*

The district court then found that neither it nor the bankruptcy court had the authority to reject a filed-rate contract. The court therefore denied the motion to reject *and* "vacated the bankruptcy court's injunctive relief because it would interfere with the performance of FERC's regulatory oversight functions." *Id.* at 516–17.

Mirant "appeal[ed] *each* of the district court's orders." *Id.* at 517 (emphasis added). And in the decretal language of our opinion, we made clear that we had answered each question: the "portion of the district court's order dismissing [the] case for lack of jurisdiction to authorize the

11

rejection . . . [was] REVERSED" while "the portion of that order vacating the bankruptcy court's injunctive relief [was] AFFIRMED," and the case was "REMANDED to the district court for proceedings not inconsistent with [the] opinion"—the entirety of the opinion. *Mirant*, 378 F.3d at 526. Therefore, the questions before us in *Mirant* were not only whether the contract could be rejected, but also the consequences of that rejection and the scope of the injunctive relief that could be issued by the bankruptcy court following that rejection. *Mirant*'s answer to that question—that the bankruptcy court had the power to enjoin FERC from enforcing the rejected contract, but did not have the authority to issue an injunction preventing FERC from taking *any* action pursuant to its broad regulatory power—was not dicta.

Instead, that language was essential to our holding in *Mirant*. First and foremost, the language regarding the division of authority between the bankruptcy courts and FERC was "an explication of the governing rules of law." *Segura*, 747 F.3d at 328 (quoting *Int'l Truck*, 372 F.3d at 721). In *Mirant*, we were deciding: (1) whether a filed-rate utility contract could be rejected; (2) if so, what rules of law governed that rejection; and (3) the bankruptcy court's authority to enforce that rejection. Analysis of the effects that rejection would have cannot be "deleted without seriously impairing the analytical foundations of the holding." *Id.* (quoting *Int'l Truck*, 372 F.3d at 721). The consequences of rejection of a filed-rate contract are central to the decision to allow rejection of said contracts, and the governing rules of law related to those consequences required explication; that discussion was not dicta.

Otherwise, should the bankruptcy court or district courts have rejected the contract, they would have been left adrift when considering how to enforce that rejection thereafter. Could either court issue the same widespread, near-all-encompassing injunction that the bankruptcy court had

previously enacted? Were they blocked from issuing any injunction at all? Or was the answer somewhere in between? Knowing that the case would be remanded, it was of paramount importance that we establish the proper bounds of authority. We did so, notably picking the middle road—that some injunctive relief was proper to "bring finality to Mirant's rejection decisions and allow the reorganization process to proceed," but that an injunction implicating any regulatory action taken by FERC (as had been "previously entered") was "overly broad." *Mirant*, 378 F.3d at 522–23. Having "provid[ed] guidance on remand," we then "l[eft] the task of crafting the language of [the] injunctive relief . . . to the bankruptcy court." *Id.* at 522. Those words of guidance were not merely suggestions, but instructions the bankruptcy court was required to follow. *See Harris v. Sentry Title Co.*, 806 F.2d 1278, 1280 n.1 (5th Cir. 1987) (concluding that guidance directed to the parties and district court on remand "may not be summarily dismissed as dictum"); *Cole Energy Dev. Co. v. Ingersoll-Rand Co.*, 8 F.3d 607, 609 (7th Cir. 1993) ("[E]xplicit rulings on issues that were before the higher court and explicit directives by that court to the lower court concerning proceedings on remand are not dicta.").

Moreover, our determination in *Mirant* that rejection has only an "indirect effect upon the filed rate" and "is not a collateral attack upon [the filed rate]" was a necessary prerequisite to our holding that a debtor can reject a filed-rate contract in bankruptcy. *Id.* at 519–20, 522. FERC would only have authority to enforce continued performance if rejection challenged the filed rate and represented an attempt to change the filed rate itself, since the filed-rate doctrine provides that "courts lack authority to impose a different rate than the one approved by [FERC]." *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 578 (1981). Since *Mirant* clearly holds that rejection of a contract is not a collateral attack on the filed rate, FERC does not have the

authority to compel continued performance and continued payment of the filed rate after a valid rejection.

We finally note that the above approach is not just the *Mirant* approach—it is also the *FirstEnergy* approach. The Sixth Circuit independently reached the same result as we did in *In re FirstEnergy Solutions Corp.*, 945 F.3d 431 (6th Cir. 2019). In doing so, the Sixth Circuit also viewed *Mirant*'s language regarding FERC's authority post-rejection as binding. It stated that "[f]ully and properly applied, *Mirant* teaches that once the bankruptcy court determined that the anticipated FERC action would directly interfere with [the debtor's] request to reject the contracts, 11 U.S.C. § 105(a) gave it the power to enjoin FERC from issuing any such contradictory order." *Id.* at 451. The Sixth Circuit also specifically rejected the argument that payment of a filed-rate is a public-law obligation that survives rejection. *Id.*

"We are always chary to create a circuit split" and doubly so "in the context of bankruptcy, where uniformity is sufficiently important that our Constitution authorizes Congress to establish 'uniform laws on the subject of bankruptcies throughout the United States.'" *In re Ultra Petroleum Corp.*, 943 F.3d 758, 763–64 (5th Cir. 2019) (first quoting *United States v. Graves*, 908 F.3d 137, 142 (5th Cir. 2018), then quoting *In re Marciano*, 708 F.3d 1123, 1135 (9th Cir. 2013) (Ikuta, J., dissenting)). To view *Mirant* in the manner that FERC asks us and then hold that payment of a filed rate is still required even if a contract is rejected would create just such a circuit split. We decline to do so.

Given that it is clear that the challenged language in *Mirant* is binding, the result of this case is straight forward. A district court (and, by extension, a bankruptcy court) has the "power . . . to authorize rejection of" a filed-rate contract and such rejection "does not conflict with the authority given to

FERC to regulate rates." *Mirant*, 378 F.3d at 518. Because such a rejection "would only have an indirect effect upon the filed rate," *id.* at 519–20, it is "not a collateral attack upon that contract's filed rate" that is prohibited outside of a hearing before FERC. *Id.* at 522. That is true so long as the rejection is based on other reasons beyond the fact that the debtor would like to pay a lower rate (as is the case here), since either modification of the rate or full abrogation of the agreement requires FERC's approval. *Id.* at 519.

Each element is satisfied here. The bankruptcy court considered and granted rejection of the contract. That rejection did not collaterally attack the rate filed with FERC because the rate was still used to set the damage award that REX (the creditor) was entitled to after rejection. Ultra (the debtor) did not seek to reject the contract because the rates were excessive (which would represent a prohibited collateral attack on the rate itself). Instead, Ultra has "suspended its drilling program[,] . . . has never shipped natural gas on the REX pipeline" under the current contract, and has been "releas[ing] its REX pipeline capacity to other natural gas shippers." Ultra is not just seeking to secure a lower rate, but instead wants out of the contract altogether, given the suspension of its drilling program and its nonuse of the volume reservation. That rejection is valid, and, under *Mirant*, does not undermine FERC's exclusive authority to set rates.

In addition, the bankruptcy court did not consider rejection under the normal business judgment standard, but instead explicitly considered the public interest in reaching its decision. In applying this higher standard, the bankruptcy court stated it was employing "*Mirant* Scrutiny." We agree with the bankruptcy court that *Mirant* requires consideration of the public interest before rejection of a filed-rate contract can be approved but, to dispel any confusion, we again reiterate that the use of a higher standard is required. A court must determine whether "the equities balance in favor of rejecting" the filed-rate contract. *Mirant*, 378 F.3d at 525 (quoting *NLRB v. Bildisco &*

*Bildisco*, 465 U.S. 513, 526 (1984)). Specifically, a court must "ensure that rejection does not cause any disruption in the supply of electricity," natural gas, or whatever regulated commodity is the subject of the contract under consideration. *Id.* Because the bankruptcy court did so here, its rejection decision was proper.

## V.

FERC advances two additional arguments for why the bankruptcy court's rejection decision was improper. It first argues that *Mirant* requires a bankruptcy court to allow FERC to comment on the public-interest ramifications of rejecting a filed-rate contract, and that because FERC "is a deliberative body that speaks through its orders," *ANR Pipeline Co. Columbia Gas Transmission, LLC*, 173 FERC ¶ 61, 131 (2020), the only way to satisfy that requirement is for FERC to conduct full proceedings before the Commission. However, *Mirant* does not include such a requirement. As stated above, *Mirant* does indeed require consideration of the public interest before a filed-rate contract can be rejected. But *Mirant* makes clear that "*courts* should carefully scrutinize the impact of rejection upon the public interest," not FERC. *Mirant*, 378 F.3d at 525 (emphasis added). We further noted that "the bankruptcy court ha[d] already indicated that it would include FERC as a party in interest for all purposes in this case" and "presume[d] that the district court would also welcome FERC's participation, if this case is not referred back to the bankruptcy court." *Id.* at 525–26. That way, "FERC [would] be able to assist *the court* in balancing these equities." *Id.* at 526 (emphasis added).

Nothing in that language can be read as requiring a bankruptcy court to allow FERC to conduct a hearing before the court can decide on rejection. To be sure, FERC's insight is highly beneficial when a court is weighing the complex and interwoven questions at the heart of the decision of whether to

reject a filed-rate contract. Therefore, to again avoid the risk that our statements in *Mirant* are read as mere recommendations, rather than commands, we make clear here that a bankruptcy court must invite FERC to participate in the bankruptcy proceedings as a party-in-interest. Whether FERC ultimately decides to participate is up to it, but the court must at least extend the invitation. The bankruptcy court did so here, welcoming FERC to participate as a party-in-interest, which FERC ultimately did. The requirements of *Mirant* were satisfied.

In addition, under the circumstances presented by this case, we decline to expand beyond our dictates in *Mirant* by requiring a bankruptcy court to halt its progress and allow FERC to hold a hearing on the public-interest ramifications of the rejection of a filed-rate contract. We fully recognize the expertise FERC has to offer and the importance of ensuring that expertise is considered when rejection of a filed-rate contract is being contemplated. However, in a Chapter 11 bankruptcy, time is of the essence and delay drains the coffers of all involved (except, of course, for those of the lawyers who would be paid to hurry up and wait). *See* Volume G Collier on Bankruptcy App. Pt. 44–590 (Richard Levin & Henry J. Sommer eds., 16th ed. 2021) ("An oft-cited goal of Chapter 11 is to encourage swift and successful reorganizations with lower transaction costs."); James J. White, *The Virtue of Speed in Bankruptcy Proceedings*, 40 L. Quad. Notes, no. 3, 1997, at 76, 79 ("Speed is an antidote to many of the substantive ills in Chapter 11. That speed will benefit not only secured creditors, but unsecured creditors as well."). The current approach balances the benefits of providing the bankruptcy court with FERC's insight with the necessity for swift and efficient bankruptcy proceedings.

FERC last argues that the bankruptcy court erred because the rejection of the REX contract amounted to a rate change, and its inclusion in

Ultra's confirmed reorganization plan violated 11 U.S.C. § 1129(a)(6). 11 U.S.C. § 1129(a)(6) states that a reorganization plan cannot be confirmed unless "[a]ny governmental regulatory commission with jurisdiction . . . over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval." FERC asserts that a rate change has occurred because Ultra will not actually pay the full amount owed on the contract after it is rejected.

However, we made clear in *Mirant* that an impermissible rate change occurs only if the actual filed rate found in the contract is changed. Such a change does not occur here because "the damages calculation from the rejection of [the] contract . . . is based upon the filed rate." *Mirant*, 378 F.3d at 520. FERC in fact made a variation of its § 1129(a)(6) argument to us when we were deciding *Mirant*, asserting that "anything less than full payment would constitute a challenge to the filed rate." That argument did not carry the day then, and does not carry the day now. We previously held that "any effect on the filed rates from a motion to reject would result not from the rejection itself, but from the application of the terms of a confirmed reorganization plan to the unsecured breach of contract claims." *Id.* at 521. We therefore made clear that the filed rate itself is separate from full payment of that rate. Since the bankruptcy court did not change the actual rate and used it to calculate the damages claim that would result from rejection of the contract, the confirmation of the reorganization plan did not violate 11 U.S.C. § 1129(a)(6).

For the foregoing reasons, we AFFIRM.