# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 14, 2022

Lyle W. Cayce
Clerk

No. 21-20008

In re: Ultra Petroleum Corporation; Keystone Gas
Gathering, L.L.C.; Ultra Resources, Incorporated;
Ultra Wyoming, Incorporated; Ultra Wyoming LGS,
L.L.C.; UP Energy Corporation; UPL Pinedale, L.L.C.;
UPL Three Rivers Holdings, L.L.C.;

*Debtors*,

Ultra Petroleum Corporation; Keystone Gas
Gathering, L.L.C.; Ultra Resources, Incorporated;
Ultra Wyoming, Incorporated; Ultra Wyoming LGS,
L.L.C.; UP Energy Corporation; UPL Pinedale, L.L.C.;
UPL Three Rivers Holdings, L.L.C.,

*Appellants*,

*versus*

Ad Hoc Committee of OpCo Unsecured Creditors; OpCo
Noteholders; Allstate Life Insurance Company;
Allstate Life Insurance Company of New York,

*Appellees*.

Appeal from the United States Bankruptcy Court
for the Southern District of Texas
USBC No. 4:16-MC-3064

Before Jolly, Elrod, and Oldham, *Circuit Judges*.

Jennifer Walker Elrod, *Circuit Judge*:

Bankruptcy is ordinarily for the insolvent. The Bankruptcy Code enables economically viable businesses in financial distress to restructure and shed some of the debt burden that crippled them. Sometimes, however, initially insolvent debtors regain solvency during extended bankruptcy proceedings. This is one such case. Ultra Petroleum Corp. (HoldCo) and its affiliates, including its subsidiary Ultra Resources, Inc. (OpCo), entered Chapter 11 bankruptcy deep in the hole. But during the bankruptcy process, these debtors (collectively, Ultra) hit it big—as natural gas prices soared, they became supremely solvent. What, then, of their debt and interest must they (re)pay their creditors now that they can?

Ultra proposed a $2.5 billion bankruptcy plan. It provided that OpCo's creditors would be paid—in full and in cash—their outstanding principal and all interest that had accrued *before* bankruptcy, plus interest on both at the Federal Judgment Rate for the duration of the bankruptcy proceeding. Two groups of creditors complain that the plan falls some $387 million short: They contend that they are entitled to a "Make-Whole Amount," a lump sum calculated to give them the present value of the interest payments they would have received but for Ultra's bankruptcy. These creditors further claim that they are owed post-petition interest at a contractually specified rate that is materially higher than the Federal Judgment Rate.

This case asks us to decide: first, whether the Bankruptcy Code precludes the creditors' claims for the Make-Whole Amount; second, even if it does, whether the traditional solvent-debtor exception applies; and third, whether post-judgment interest is to be calculated at the contractual or Federal Judgment rate. We hold that the Bankruptcy Code disallows the Make-Whole Amount as the economic equivalent of unmatured interest. But because Congress has not clearly abrogated the solvent-debtor exception, we

No. 21-20008

hold that it applies to this case. And the solvent-debtor exception demands that Ultra pay what it promised now that it is financially capable. We likewise hold that, given Ultra's solvency, post-petition interest is to be calculated according to the agreed-upon contractual rate. Thus, we AFFIRM.

## I.

Ultra is a family of natural gas exploration and production companies. In 2014 and 2015, a sharp decline in natural gas prices drove Ultra to insolvency and thence to the protection of Chapter 11 bankruptcy in early 2016. During the bankruptcy proceedings, the same volatile commodity prices that hurled Ultra into insolvency propelled the debtors back into solvency. Indeed, Ultra became "massively solvent."

Ultra proposed a plan that would pay—in full and in cash—all unsecured claims, including those of its noteholders and revolving credit facility creditors (collectively, Creditors).[1] Ultra would thus pay Creditors' entire outstanding principal along with all accrued *pre*-petition interest at the contractual rate, plus *post*-petition interest at the Federal Judgment Rate, as specified at 28 U.S.C. § 1961(a).[2] In Ultra's view, the plan paid Creditors fully for every claim that the Bankruptcy Code allowed. For this reason, Ultra classified these Creditors as "unimpaired" under 11 U.S.C.

---

[1] Unless otherwise indicated, "Creditors" will generally refer to both groups of creditor–appellees: (1) OpCo Noteholders (a group of over forty insurance companies, hedge funds, and other institutional investors); and (2) the Ad Hoc Committee of OpCo Unsecured Creditors, which represents both note and revolver creditors (a similar group of twenty investors).

[2] The Federal Judgement Rate as of April 29, 2016, the date of Ultra's bankruptcy petition (the applicable rate for the confirmed plan) was 54 basis points (0.54%), which is materially lower than the contractual rate, defined as the greater of 2% over either of two benchmark rates. 28 U.S.C. § 1961; Post-Judgment Interest Rates – 2016, (Week Ending April 22, 2016), United States District & Bankruptcy Court, Southern District of Texas, https://www.txs.uscourts.gov/page/post-judgment-interest-rates-2016.

§§ 1123(a)(2), 1124. And given their status as "unimpaired," Creditors were thus "conclusively presumed to have accepted the plan" per § 1126(f). In other words, they had no right to vote on it.

Creditors objected. They contended that the plan *did* impair them because it did not allow for claims stemming from two contractual provisions in their debt instruments—a shortfall of some $387 million. Not so, countered Ultra—those two provisions simply did not give rise to allowable claims under the Bankruptcy Code.

The parties stipulated that this dispute could be resolved after plan confirmation. Ultra created a $400 million reserve to cover the alleged shortfall, and the bankruptcy court confirmed the plan. The bankruptcy court then addressed Creditors' "impaired" status vis-à-vis the disputed amounts, concluding that Creditors remained impaired unless they were paid the full amount permitted under applicable non-bankruptcy law. *In re Ultra Petroleum Corp.*, 575 B.R. 361, 366–75 (Bankr. S.D. Tex. 2017). Ultra appealed directly to this court.

We reversed. *In re Ultra Petroleum Corp.*, 943 F.3d 758 (5th Cir. 2019). We held that "[w]here a plan refuses to pay funds disallowed by the Code, the Code—not the plan—is doing the impairing." *Id.* at 765. The issue of impairment thus set aside, the only question remaining was whether Creditors were, in fact, entitled to the disputed claims under the Bankruptcy Code's disallowance provisions. On this score, we remanded to the bankruptcy court to render a decision in the first instance. *Id.* at 765–66.

On remand, the bankruptcy court faced the dispositive question of whether Creditors' disputed claims were indeed disallowed under the Bankruptcy Code. Creditors' disputed claims stemmed from two OpCo debt instruments:

No. 21-20008

1.      OpCo Notes issued under a Master Note Purchase Agreement (MNPA) (totaling $1.46 billion in principal); and

2.      a Revolving Credit Facility (RCF) ($999 million in principal).

Creditors claimed a "Make-Whole Amount" under the MNPA, and under both the MNPA and the RCF, they claimed interest calculated according to a contractually specified "default rate" on all amounts due and payable at the time that Ultra filed for bankruptcy.

Under both the MNPA and the RCF, the occurrence of any contractually enumerated "Event of Default" renders any outstanding principal immediately due and payable. Under the MNPA, such an Event also triggers the requirement that OpCo pay Creditors an additional Make-Whole Amount. The Make-Whole Amount, stripped of the contract's financial jargon, is simply the value of all future unmatured interest payments on the Notes, expressed in today's dollars.[3]

Among the Events of Default that trigger principal acceleration and the Make-Whole provision is the filing of a petition for bankruptcy. Thus, the moment that Ultra filed, the remaining principal on both debt instruments became due, and Ultra contractually owed the Noteholders the Make-Whole Amount—a sum clocking in around $201 million.

---

[3] Here is the nitty-gritty: The MNPA defines the Make-Whole Amount as "the excess, if any, of the Discounted Value of the Remaining Scheduled Payments with respect to the Called Principal of such fixed rate Note over the amount of such Called Principal." The "Remaining Scheduled Payments" are the payments of interest and principal that would have occurred absent OpCo's default. These payments are summed and discounted to their present value using a discount factor 50 basis points over the yield to maturity of Treasury securities comparable in risk profile to the OpCo Notes. From this figure is subtracted the "Called Principal"—the unpaid balance of the Notes' principal that was accelerated on default. The Make-Whole Amount is any resultant positive number.

On top of this, both the MNPA and the RCF specified a hefty contractual "default rate" of interest to accrue on the accelerated principal and the Make-Whole Amount for so long as these amounts remained unpaid.[4] Since bankruptcy's automatic stay prevents payment, this default-rate interest effectively accrued until plan confirmation. Creditors accordingly sought to recover $106 million in interest on the accelerated principal and $14 million in interest on the Make-Whole Amount.

Ultra objected to both the Make-Whole Amount and the default-rate interest, which together totaled some $387 million. In its view, the Make-Whole Amount was either an unenforceable penalty under governing New York law or else impermissible "unmatured interest," both of which are disallowed by the Bankruptcy Code. Ultra further urged that the interest accrued at the contractual default rate far exceeded the appropriate amount of interest, which, it contended, should be calculated at the Code's "legal rate" of post-petition interest: namely, the Federal Judgment Rate.[5]

On remand from this court to decide in the first instance whether these disputed amounts were allowable under the Bankruptcy Code (and, therefore, necessary for Creditors to be deemed unimpaired), the bankruptcy court ruled in Creditors' favor. *In re Ultra Petroleum Corp.*, 624 B.R. 178, 191–95, 202–04 (Bankr. S.D. Tex. 2020). The Make-Whole Amount, it held, was enforceable under New York law, and it constituted neither "unmatured interest" nor its "economic equivalent" for the purpose of § 502(b)(2). *Id.* at 191–95. As to post-petition interest, the bankruptcy court held that the

---

[4] Both instruments defined the rate as the greater of two percent over the Notes' usual rate or two percent over the JPMorgan Chase prime rate.

[5] As noted above, the applicable Federal Judgment Rate as of Ultra's petition date would have been 58 basis points (0.58%), which is materially less than the contractual default rate of over 2%. *See supra* n.2.

historically rooted "solvent-debtor exception" to the Bankruptcy Code's prohibition of unmatured interest entitled Creditors to such interest at the contractual default rate rather than the lower Federal Judgment Rate. *Id.* at 195–204. All told, the bankruptcy court's ruling would require Ultra to pay Creditors the entire $387 million that they sought. Ultra again appealed timely and directly to this court.[6]

## II.

This appeal presents pure questions of bankruptcy law, which we review *de novo*. *Ultra*, 943 F.3d at 762.

We begin with the Make-Whole Amount. Because we need only address the solvent-debtor exception to the extent that the Bankruptcy Code would disallow the Make-Whole Amount, we first consider whether the Make-Whole Amount constitutes disallowed unmatured interest under 11 U.S.C. § 502(b)(2). Concluding that it does, we then consider whether the solvent-debtor exception survived the enactment of the Bankruptcy Code in 1978 and thus whether it still applies to suspend the Code's disallowance of the Make-Whole Amount as unmatured interest. Because the exception does indeed survive intact, we then consider whether the Make-Whole Amount is an unenforceable penalty under New York law, in which case the exception could not save it. But because it is enforceable under state law, we conclude that Ultra must pay the Make-Whole Amount as a solvent debtor.

Finally, we turn to the rate of post-petition interest. Because, as the parties agree, Ultra must receive *some* post-petition interest to remain unimpaired, we must decide only which rate to apply: the contractual default

---

[6] The bankruptcy court granted Ultra's motion for certification of direct appeal, and this court granted Ultra's petition for direct appeal. We therefore have jurisdiction over this appeal under 28 U.S.C. § 158(d)(2).

No. 21-20008

rate or the Federal Judgment Rate. We conclude that in this solvent-debtor case, the contractual default rate is appropriate. We therefore affirm.

A.

Section 502(b)(2) of the Bankruptcy Code disallows "claim[s] . . . for unmatured interest." We have interpreted that provision to disallow the "economic equivalent of 'unmatured interest'" as well. *In re Pengo Indus., Inc.*, 962 F.2d 543, 546 (5th Cir. 1992) (citation omitted); *accord In re Chateaugay Corp.*, 961 F.2d 378, 380–81 (2d Cir. 1992).[7] Otherwise, the Code's disallowance of unmatured interest would be susceptible to easy end-runs by canny creditors. *See Pengo*, 962 F.2d at 543 (refusing to allow an end-run around the Code's disallowance of unmatured interest by recharacterizing as "principal" what is essentially interest).

Contractual make-whole amounts, like the one at issue here, are expressly designed to liquidate fixed-rate lenders' damages flowing from debtor default while market interest rates are lower than their contractual rates. Lenders' damages equal the present value of all their future interest

---

[7] *See also In re Doctors Hosp. of Hyde Park, Inc.*, 508 B.R. 697, 705 (Bankr. N.D. Ill. 2014) (noting that "courts look to the *economic substance* of the transaction to determine what counts as interest" and holding that a "Yield Maintenance Premium" is subject to § 502(b)(2) disallowance because it "serves the purpose of interest *in economic reality*" (emphases added)); *In re Ridgewood Apartments of DeKalb Cnty., Ltd.*, 174 B.R. 712, 720–21 (Bankr. S.D. Ohio 1994) (holding the "clear purpose [of] a prepayment penalty" to be to "compensate the lender for anticipated interest," and therefore disallowing a claim for such); *In re Pub. Serv. Co. of N.H.*, 114 B.R. 800, 803 (Bankr. D.N.H. 1990) (holding that, "in economic fact," an original issue discount "is interest" subject to § 502(b)(2)); *cf. Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1048–49 (9th Cir. 2003) (holding that damages stemming from default on interest-rate swap cannot constitute "interest" under § 502(b)(2) because "[a] fundamental characteristic of an interest rate swap is that the counterparties never actually loan or advance the notional amount"); *In re Hertz Corp.*, 637 B.R. 781, 791 (Bankr. D. Del. 2021) (adopting the "economic equivalent of unmatured interest" interpretation of § 502(b)(2)).

payments. In other words, a make-whole amount is nothing more than a lender's unmatured interest, rendered in today's dollars. *See In re Energy Future Holdings Corp.*, 842 F.3d 247, 251 (3d Cir. 2016) (referring to a make-whole as a "contractual substitute for interest lost on [n]otes redeemed before their expected due date"); *In re MPM Silicones, L.L.C.*, 874 F.3d 787, 801 n.13 (2d Cir. 2017) (same). It is—rather precisely—the "economic equivalent of 'unmatured interest.'" *Pengo*, 962 F.2d at 546 (citation omitted).

Because the Make-Whole Amount here is the "economic equivalent" of a lender's "unmatured interest," the Code—per our circuit's precedent—disallows it. *See* 11 U.S.C. § 501(b)(2); *Pengo*, 962 F.2d at 546. Against this straightforward syllogism, Creditors lodge an array of objections. None succeeds.

1.

Creditors first contend that the Make-Whole Amount is simply not unmatured interest: it is neither "interest" nor "unmatured" (if it were interest), they argue. Neither of these arguments has merit.

Creditors rely heavily on dictionary and case law definitions of the term "interest." Interest, they say, is "consideration for the *use or forbearance* of another's money accruing over time." Brief for Appellee Ad Hoc Committee of OpCo Unsecured Creditors at 37 (quoting *Ultra*, 624 B.R. at 184). And because the Make-Whole Amount does not compensate Creditors for any actual "use or forbearance," it therefore cannot be "interest."

This argument fails. Even on the terms of Creditors' own argument, the Make-Whole Amount *does* constitute compensation for "use or forbearance" of Creditors' principal—it compensates Creditors for the *future* use of their money, albeit use that will never actually occur because of

Ultra's default. This is simply another way of saying that the interest is *unmatured*. And unmatured interest is still interest.[8]

Assuming *arguendo* that the Make-Whole Amount is interest, Creditors next argue that it had matured—albeit at the very moment of Ultra's filing for bankruptcy. If that were so, the Make-Whole Amount would narrowly escape § 502(b)(2)'s gaping maw: it would be an allowable claim for (barely) matured interest. This argument also fails.

The bankruptcy court correctly rejected the argument, reasoning that the MNPA's acceleration provision was an *ipso facto* clause that is not to be considered in assessing whether the payment it triggered had matured. *Ultra*, 624 B.R. at 188 (citing *In re ICH Corp.*, 230 B.R. 88, 94 (N.D. Tex. 1999)). But, more to the point, a make-whole amount contractually triggered by a bankruptcy petition cannot antedate that same bankruptcy petition. First the petition is filed; then the make-whole amount becomes due—first the cause; then the effect. Thus, if it is indeed "interest," the make-whole amount is also "unmatured" as of the time of filing—and therefore subject to § 502(b)(2) disallowance.

---

[8] If we accepted Creditors' contention that the Make-Whole Amount could not be "interest" because it does not compensate for the (prior) use of another's money, then the term "unmatured interest" in 11 U.S.C. § 502(b)(2) would be vacuous: Until it matures, *no* "interest" compensates for the use of another's money—it is "interest" only in an anticipatory sense (*i.e.*, it *will* compensate for the use of another's money when it becomes due). Interest is only "interest" when it matures. On Creditors' argument, therefore, "unmatured interest" would be a paradox.

Creditors also recharacterize the Make-Whole Amount as "compensat[ion] . . . for Ultra's decision *not* to use their money." Brief for Ad Hoc Committee of OpCo Unsecured Creditors at 38 (quoting *Ultra*, 624 B.R. at 188). But this, again, is just another way of saying that the Make-Whole Amount *is* interest—albeit *future* interest that will never mature because of Ultra's default.

Let us suppose, though, that Creditors' characterization of the Make-Whole Amount as something other than unmatured interest were correct. Their arguments would founder nonetheless. In our circuit, we evaluate whether a claim is disallowed under § 502(b)(2) based on whether the claim is for the "economic equivalent of unmatured interest"—not simply whether the claim is *itself* for "unmatured interest." *Pengo*, 962 F.2d at 546. What matters in this context is the underlying "economic reality" of the thing—not dictionary definitions or formalistic labels. *Id.* So, to the extent that Creditors argue, even successfully, that the Make-Whole Amount is not "unmatured interest," they are barking up the wrong tree.

2.

This brings us to Creditors' second chief contention: *Pengo* did not mean what it said when it interpreted § 502(b)(2) to disallow claims for the "economic equivalent of unmatured interest." Creditors attempt to cabin this controlling case to its facts. In *Pengo*, we held that a debt instrument with an "Original Issue Discount" (OID) constituted unmatured interest as a matter of "economic fact." *Id.* In essence, an OID security disguises interest as principal.[9] Recognizing this, we held that we must look through the labels assigned to claims to evaluate their underlying "economic realit[ies]." *Id.*; *accord Chateaugay*, 961 F.2d at 380 ("As a matter of economic definition, OID constitutes interest."). And when the reality of things—the economic

---

[9] Here is a simple example of how an OID works: Lender L issues Debtor D a loan in return for a Security S with a face value of $100. But, instead of handing over $100, L gives D only $90. Still, S's principal is $100 and must be repaid over the term of the loan. The $10 difference between face-value principal and actual credit extended, while denominated "principal," serves exactly the same purpose as interest: it compensates L for extending the loan.

fact of the matter—is that a particular claim is really just the functional equivalent of unmatured interest, § 502(b)(2) disallows it.

Creditors attempt to distinguish the Make-Whole Amount at issue here from *Pengo*'s OIDs on the basis that an OID is an "assured payment," whereas Creditors' Make-Whole Amount is "contingent." The relevance of this distinction, though, is hazy at best. At most, it shows that OIDs are not narrowly tailored liquidated damages that account for market conditions at the time of debtor breach. The Make-Whole Amount, meanwhile, *does* constitute well-tailored liquidated damages: it pays out only when and to the extent that the Creditors are actually harmed by Ultra's breach. Yet this distinction does nothing to mitigate the force of *Pengo*'s holding: If the claim in question is the "economic equivalent of unmatured interest," it is disallowed by § 502(b)(2). Whether the claim also happens to be denominated "liquidated damages" is beside the point. Like interest masquerading as "principal," interest labeled "liquidated damages" is still interest.[10]

---

[10] Creditors also unpersuasively urge that *Pengo* was really just about OIDs, pointing to our icing-on-the-cake argument from legislative history: the Code's drafters mentioned OIDs as examples of claims disallowed under § 502(b)(2). But in *Pengo*, we prefaced our mention of this fact with: "*Moreover*, the legislative history *verifies* our [conclusion] . . . ." 962 F.2d at 546 (emphases added). We certainly did *not* suggest that legislative history was dispositive in *Pengo*, let alone that legislative history could narrow the scope of a statutory provision. And regardless, as we have recently said, also in interpreting the Bankruptcy Code, "We are reluctant to rely on legislative history for the simple reason that it's not law." *In re DeBerry*, 945 F.3d 943, 949 (5th Cir. 2019).

No. 21-20008

3.

We thus arrive at Creditors' final set of arguments. Creditors broadly argue that the Make-Whole Amount is not the "economic equivalent of unmatured interest," but rather "liquidated damages," as a number of bankruptcy courts have held. *See, e.g.*, *In re Trico Marine Servs., Inc.*, 450 B.R. 474, 480 (Bankr. D. Del. 2011). They suggest that even though unmatured interest factors heavily into the Make-Whole Amount's calculation, the figure that the formula spits out is itself something different in kind. This argument is untenable.

Creditors acknowledge, as they must, that a key ingredient in the formula used to calculate the Make-Whole Amount is the sum of Ultra's unmatured interest (and principal) future payments. Creditors posit that the formula somehow transmogrifies its inputs, including the key input—unmatured interest—into something fundamentally different on the other side of the equals sign. To suggest otherwise, they say, "makes no more sense than saying that the area of a circle constitutes $\pi$ because its formula is $\pi r^2$." Brief for Appellee Ad Hoc Committee of OpCo Unsecured Creditors at 40. This argument proves far too much. Consider this formula for a hypothetical 'Fake-Whole' Amount:

$$\text{Fake-Whole Amount} =$$
$$(\Sigma \, [\text{all unmatured interest payments}] + \$1.00) \times 1$$

Of course, this Fake-Whole Amount is nothing more than unmatured interest plus one dollar (for good measure). Nothing transformative happened here. To determine whether a formula's output bears some identity with any of its inputs requires looking at the formula itself. And the Make-Whole formula, like the Fake-Whole formula, does nothing to its unmatured interest component to render the result different in kind.

13

No. 21-20008

In fact, the Make-Whole Amount's formula yields *precisely* the "economic equivalent" of Creditors' unmatured interest. The formula simply accounts for the time-value of money: A dollar today is worth more than a dollar tomorrow. The sum of unmatured interest payments today is worth more than that same set of payments paid out incrementally in the future. To create the "economic equivalent" of that unmatured interest *today*, the sum of those payments must be discounted by a factor representing the appropriate reinvestment rate—what the Creditors could earn on comparable securities in the present market. That is exactly what the Make-Whole formula does. The Make-Whole Amount is exactly the "economic equivalent of unmatured interest."

Creditors protest that the Make-Whole Amount functions more like ordinary damages to compensate them for the transaction costs involved in securing a comparable loan. Conceding that the dichotomy between "liquidated damages" and "unmatured interest" (or its "economic equivalent") is not so airtight as their briefs generally suggest, Creditors acknowledge that whether a given make-whole amount is allowable or disallowable liquidated damages turns "on the dynamics of the individual case." Brief for Appellee Ad Hoc Committee of OpCo Unsecured Creditors at 44, 46–47; Brief for Appellee OpCo Noteholders at 38–39; *see also Ultra*, 943 F.3d at 765. And Creditors insist that *this* Make-Whole Amount is *allowable* liquidated damages—not disallowed unmatured interest in the form of liquidated damages.

In making this argument, Creditors adopt by reference the bankruptcy court's chain of reasoning below. The bankruptcy court posed a hypothetical involving a three-party transaction: Borrower B prepays his Loan from Lender L, who turns to Broker K to identify a New Borrower N who will accept a New Loan identical to B's original Loan. But to find N and secure the loan at the same rate, K charges L a fee of 2%, which B must pay L in

damages for prepayment. Would that 2% fee constitute unmatured interest? No, the court said, it is just the "negotiated cost to compensate the lender for making a new loan on comparable terms in a changed market." *Ultra*, 624 B.R. at 190. "The hypothetical is no different than the Make-Whole at issue here." *Id.*

But it *is* different. The relevant consideration is whether the make-whole amount merely compensates the borrower for the search and transaction costs of "seek[ing] to find someone else to use the capital," or goes further and compensates creditors for the loss of future interest "through the guise of a make-whole premium." Douglas G. Baird, Elements of Bankruptcy 84–85 (6th ed. 2014).[11] The bankruptcy court's helpful hypothetical illustrates the fact that there is non-overlapping space in the Venn Diagram between liquidated damages and unmatured interest. Liquidated damages certainly *can* compensate for anticipated transaction costs that are *not* unmatured interest. But the Make-Whole Amount, unlike the transaction-costs liquidated damages in the hypothetical, is *both* liquidated damages *and* the "economic equivalent of unmatured interest"— indeed, that is its whole point.[12]

---

[11] *See Hertz*, 637 B.R. at 791 ("If it were enough to just label a make-whole claim liquidated damages . . . , then a contract providing that on default or redemption 'all unmatured interest' would be immediately due and payable could avoid the effect of section 502(b)(2) completely.").

[12] *But see generally* Douglas G. Baird, *Making Sense of Make-Wholes*, 94 Am. Bankr. L.J. 567, 580 (2020) ("When a make-whole clause represents the parties' good faith estimate of the loss of a favorable rate of interest, it is merely serving as a liquidated damages clause, and bankruptcy judges should enforce it for the same reason judges enforce such clauses outside of bankruptcy."). Professor Baird eloquently argues that a claim for the difference between a fixed and floating interest rate does not *necessarily* constitute unmatured interest. *Id.* at 579–580 ("An obligation owed on a bad bet—involving changes in the rate of interest or anything else—is not in and of itself an obligation to pay unmatured interest."); *but cf. Thrifty Oil Co.*, 322 F.3d at 1048–49 (implying, in a case involving

No. 21-20008

B.

Although we have concluded that Creditors' claim for the Make-Whole Amount is indeed a claim for unmatured interest or its economic equivalent as disallowed under 11 U.S.C. § 502(b)(2), we are not done. We must evaluate whether the solvent-debtor exception survived the Bankruptcy Code's enactment and applies to this case. We conclude that it does. For this reason, Ultra must pay the Make-Whole Amount.

In the ordinary case, the Bankruptcy Code would disallow a make-whole amount that functionally equates to unmatured interest. But this is not the ordinary case. Ultra became ultra solvent. And when a debtor is able to pay its valid contractual debts, traditional doctrine says it should—bankruptcy rules notwithstanding.

We begin with history, tracing the English provenance of the solvent-debtor exception, and its incorporation into American bankruptcy law. We then examine Ultra's contention that the 1978 Bankruptcy Code abrogated the traditional exception. Although it is a close call, the Supreme Court has instructed us not to infer abrogation of traditional bankruptcy practice.

---

interest-rate swaps, that such a claim is not "interest" only when "no advance of money has occurred between the . . . counterparties" with respect to that claim—*i.e.*, when there is no principal). Professor Baird makes the case that make-whole amounts in a variable interest-rate environment are different in kind than sums of unmatured fixed-rate interest in a stable interest-rate market. He concludes that it comports with longstanding bankruptcy principles and policy to allow claims for make-whole amounts.

Be that as it may, the Code as interpreted by this circuit's binding precedent disallows the "economic equivalent of unmatured interest." *Pengo*, 962 F.2d at 546. And, as discussed above, Creditors' Make-Whole Amount represents the economic equivalent of interest that had not matured as of the petition date, even though it *also* constitutes liquidated damages. The conclusion inexorably follows that the Make-Whole Amount must be disallowed under current law, even though policy considerations may favor allowance.

Because the Code's general bar on claims for unmatured interest does not specifically address the solvent-debtor scenario, for which traditional bankruptcy practice has always provided an exception, we conclude that the pre-Code doctrine concerning solvent debtors' obligations remains good law, and the exception operates in this case to suspend § 502(b)(2)'s disallowance of Creditors' Make-Whole Amount.

1.

For some three centuries of bankruptcy law, courts have held that an equitable exception to the usual rules applies in the unusual case of a solvent debtor. When a debtor proves solvent—that is, when the debtor's assets exceed its liabilities—bankruptcy's ordinary suspension of post-petition interest is itself suspended. When a debtor can pay its creditors interest on its unpaid obligations in keeping with the valid terms of their contract, it must. *Am. Iron & Steel Mfg. Co. v. Seaboard Air Line Ry.*, 233 U.S. 261, 266 (1914) ("[I]f, as a result of good fortune or good management, the [debtor's] estate prove[s] sufficient to discharge the claims in full, interest as well as principal should be paid."); *see also Debentureholders Protective Comm. of Cont'l Inv. Corp. v. Cont'l Inv. Corp.*, 679 F.2d 264, 269 (1st Cir. 1982) ("Where the debtor is solvent, the bankruptcy rule is that where there is a contractual provision, valid under state law, providing for interest on unpaid instalments of interest, the bankruptcy court will enforce the contractual provision with respect to both instalments due before *and . . . after* the petition was filed." (emphasis added)).

As with many of our bankruptcy rules, this doctrine originated in eighteenth-century English practice. *See* 2 William Blackstone, Commentaries *488 ("[T]hough the usual rule is, that all interest on debts carrying interest shall cease from the time of issuing the commission, yet, in case of a surplus left after payment of every debt, such interest shall again

revive, and be chargeable on the bankrupt . . . ."); *see also, e.g.*, *Bromley v. Goodere* (1743) 26 Eng. Rep. 49, 52; 1 Atk. 75, 80 ("[S]uppos[ing] . . . there should be a surplus, it would be absurd to say the creditors should not have interest . . . ."); *Ex parte Rooke* (1753) 26 Eng. Rep. 156, 157; 1 Atk. 244, 245 (ordering solvent bankruptcy petitioner "to pay the principal *and interest . . .* to all his creditors" (emphasis added)).[13]

Our forebears adopted English practice in our nation's nascent nineteenth-century bankruptcy system. *See Sexton v. Dreyfus*, 219 U.S. 339, 344 (1911) (Holmes, J.) ("We take our bankruptcy system from England, and we naturally assume that the fundamental principles upon which it was administered were adopted by us when we copied the system . . . .");[14] *see also Debentureholders*, 679 F.2d at 269 (referring to "the settled English and American law that when an alleged bankrupt is proved solvent, the creditors are entitled to receive post-petition interest before any surplus reverts to the debtor"). And as the Supreme Court has said, the English solvent-debtor exception "ha[s] been carried over into our system." *City of New York v.*

---

[13] *See also, e.g.*, *Ex parte Mills* (1793) 30 Eng. Rep. 640, 644; 2 Ves. Jun. 294, 303 (ordering payment of "interest upon [the solvent bankrupt's] debts, as either upon the face of the security or by force of the contract between the parties carry interest"); Bankruptcy Act of 1825, 6 Geo. 4 c. 16, § 132 (codifying the doctrine that "all Creditors whose Debts are now by Law entitled to carry Interest, in the Event of a Surplus, shall first receive Interest on such Debts . . . ."); *cf. Ex parte Marlar* (1746) 26 Eng. Rep. 97, 98; 1 Atk. 150, 152 (stating the rule in solvent-debtor cases "that note-creditors have no right to prove interest upon them, *unless it is expressed in the body of the notes*"); *Ex parte Williams.—In the Matter of Wilcocks*, 1 Cases in Bankruptcy 399, 399 (George Rose ed. 1813) ("Where there is a Surplus of the Bankrupt's Estate, Creditors are not entitled to Interest upon Debts, *unless it has been provided for by Contract*, either express, or implied . . . ." (emphasis added)).

[14] *But see Sloan v. Lewis*, 89 U.S. 150, 157 (1874) ("The English cases referred to in the argument, in our opinion, have no application here. They are founded upon the English statutes and the established practice under them. Our statute is different in its provisions and requires, as we think, a different practice.")

*Saper*, 336 U.S. 328, 330 n.7 (1949); *see also United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 246 (1989) (noting the solvent-debtor exception's "recogni[tion] under pre-Code [American] practice").

The reason for this traditional, judicially-crafted exception is straightforward: Solvent debtors are, by definition, able to pay their debts in full on their contractual terms, and absent a legitimate bankruptcy reason to the contrary, they should. Unlike the typical insolvent bankrupt, a solvent debtor's pie is large enough for every creditor to have his full slice. With an insolvent debtor, halting contractual interest from accruing serves the legitimate bankruptcy interest of equitably distributing a limited pie among competing creditors as of the time of the debtor's filing. *See Am. Iron & Steel*, 233 U.S. at 266.[15] With a solvent debtor, that legitimate bankruptcy interest is not present.[16] *See In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 791 F.2d 524, 527–28 (7th Cir. 1986) (Posner, J.) ("The only good reason for refusing to give a creditor in reorganization all that he bargained for when he extended credit is to help other creditors, the debtor's assets being insufficient to pay all creditors in full . . . . [But] if the bankrupt is solvent the

---

[15] *See also* Thomas H. Jackson & Robert E. Scott, *On the Nature of Bankruptcy: An Essay on Bankruptcy Sharing and the Creditors' Bargain*, 75 Va. L. Rev. 155, 155 (1989) ("[P]rebankruptcy entitlements should be impaired in bankruptcy only when necessary to maximize net asset distributions to the creditors as a group . . . ."); Ginsburg & Martin on Bankruptcy § 1.01 (6th ed. 2022) (noting that the primary goal of United States bankruptcy law is to "promote equality of distribution among similarly situated creditors" from a limited estate).

[16] There exists a gray area, however, where a debtor is solvent enough to pay in full all allowed claims, but the surplus is not enough to cover all creditors' otherwise disallowed interest. In such a case, legitimate bankruptcy interests may well warrant a more nuanced application of the solvent-debtor exception. *See* Scott C. Shelley & Solomon J. Noh, *Show Me the Money: Another Look at Postpetition Interest in Solvent Debtor Chapter 11 Cases*, 24 Emory Bankr. Dev. J. 361, 370–71 (2008). But that situation is not present here, so we need not address it.

task for the bankruptcy court is simply to enforce creditors' rights according to the tenor of the contracts that created those rights . . . ."). Therefore, solvent debtors should be exempted from the general rule disallowing unmatured interest from accruing post-petition, and this "solvent-debtor exception" simply follows from the first principles of bankruptcy law.

2.

In the face of the solvent-debtor exception's historical provenance and comportment with bankruptcy's fundamental principles, Ultra argues that Congress nonetheless abrogated it in enacting the 1978 Bankruptcy Code. The Code's straightforward disallowance of claims for unmatured interest in § 502(b)(2) does not distinguish solvent and insolvent debtors. Ultra cites a string of bankruptcy court opinions and two circuit cases for the proposition that § 502(b)(2) applies regardless of debtor solvency. Brief for Appellants at 26 (citing, *inter alia*, *In re Gencarelli*, 501 F.3d 1 (1st Cir. 2007) and *In re Dow Corning Corp.*, 456 F.3d 668 (6th Cir. 2006)).[17] Ultra further urges the court to draw negative implications from the Code's provision for impaired creditors to receive interest at "the legal rate" when a debtor proves sufficiently solvent. *See* 11 U.S.C. §§ 726(a)(5), 1129(a)(7)(A)(ii). If Congress provided for interest in this circumstance but said nothing else

---

[17] *See also In re Ancona*, No. 14-10532, 2016 WL 828099, at *6 (Bankr. S.D.N.Y. Mar. 2, 2016) (rejecting "the proposition that a court must first find a debtor to be insolvent or determine all other claims against a debtor before analyzing a [§ 502(b)(6)] claim"); *In re Flanigan*, 374 B.R. 568, 575 (Bankr. W.D. Pa. 2007) (same); *In re Farley, Inc.*, 146 B.R. 739, 747–48 (Bankr. N.D. Ill. 1992) (same); *In re Federated Dep't Stores, Inc.*, 131 B.R. 808, 817 (S.D. Ohio 1991) (same); *In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 345–46 (Bankr. D. Del. 1998); *HSBC Bank USA, Nat'l Ass'n v. Calpine Corp.*, No. 07-CIV-3088, 2010 WL 3835200, at *5, *10 (S.D.N.Y. Sept. 15, 2010) (applying § 502(b)(2) in a "very solvent" debtor case).

about solvent debtors generally, no broader exception should be inferred—*expressio unius est exclusio alterius.*

Creditors respond with equal and opposite force. Under American bankruptcy statutes in place from the late nineteenth century through much of the twentieth century, claims for unmatured interest were expressly disallowed; nevertheless, courts regularly applied the solvent-debtor exception. *See* Bankruptcy Act of 1898, Pub. L. No. 55-541, § 63, 30 Stat. 544, 563 (1898) (limiting interest on provable claims to interest "which would have been recoverable" when the petition was filed, and subtracting "interests accrued *after* the filing of the petition" (emphasis added)); Bankruptcy Act of 1938 (Chandler Act), Pub. L. No. 75-696, § 63, 52 Stat. 840, 873 (1938) (same); *see, e.g.*, *Johnson v. Norris*, 190 F. 459, 461–65 (5th Cir. 1911) (concluding that § 63 of the Bankruptcy Act "was not intended to be applied to a solvent estate"); *Ruskin v. Griffiths*, 269 F.2d 827, 829–32 (2d Cir. 1959) (awarding post-default interest on overdue interest and accelerated principal at a heightened contractual rate because the debtor was solvent, despite the then-applicable bankruptcy acts' preclusion of unmatured interest); *cf. Saper*, 336 U.S. at 330–32, 330 n.7 (acknowledging American adoption and retention of the solvent-debtor exception in our nation's bankruptcy practice, even after the Bankruptcy Act of 1898 and the 1938 Chandler Amendments codified the "long-standing rule against post-bankruptcy interest").[18]

---

[18] *See also, e.g.*, *Brown v. Leo*, 34 F.2d 127, 127 (2d Cir. 1929) (recognizing that § 63 of the 1898 Bankruptcy Act fixes "the time when interest stops . . . as the date of the filing of the petition," but noting that the estate at issue there was solvent, so "neither the rule nor the reason for stopping interest at the date of the filing of the petition applies"); *Sword Line, Inc. v. Indus. Comm'r of N.Y.*, 212 F.2d 865, 870 (2d Cir. 1954) ("[I]nterest ceases upon bankruptcy in the general and usual instances noted . . . unless the bankruptcy bar proves eventually nonexistent by reason of the actual solvency of the debtor."); *Littleton v. Kincaid*, 179 F.2d 848, 852 (4th Cir. 1950) ("[W]hen this unusual event [*i.e.*, debtor

No. 21-20008

This historical bankruptcy practice, Creditors argue, demonstrates that Congressional recodification of the Bankruptcy Act's § 63 disallowance of unmatured interest in § 502(b)(2) of the 1978 Bankruptcy Code did not expressly abrogate the solvent-debtor exception. If Congress legislated cognizant of courts' practice of excepting solvent debtors from the generally applicable statutory disallowance of § 63, one would expect it to have *expressly* abrogated the judicial exception if it intended to do so.

3.

The parties' competing arguments center on how we expect Congress to draft statutes and, specifically, what we are to make of congressional silence. Ultra assumes, not unreasonably, that Congress means what it says and that, when Congress says one thing but not another, it means to exclude what it did not say. Creditors, meanwhile, assume that Congress legislates against a historical backdrop, and that when courts historically have fashioned an exception to a clear statutory provision, Congress is presumed to accept that practice unless it expressly says otherwise. These equally sensible presumptions are at loggerheads.

The Supreme Court breaks the tie. We must defer to prior bankruptcy practice unless expressly abrogated. The Court has endorsed a substantive canon of interpretation regarding the Bankruptcy Code vis-à-vis preexisting bankruptcy doctrine. Namely, abrogation of a prior bankruptcy practice generally requires an "unmistakably clear" statement on the part of

---

solvency in bankruptcy] occurs interest is payable out of this surplus to the date of payment."); *In re Magnus Harmonica Corp.*, 159 F. Supp. 778, 780 (D.N.J. 1958) (enumerating as an explicit, judicially devised exception to § 63 of the Bankruptcy Act that "[w]here the estate of the debtor is sufficient to pay all of his debts, including interest, interest may be allowed to the date of payment"), *aff'd*, 262 F.2d 515 (3d Cir. 1959); *In re Int'l Hydro-Elec. Sys.*, 101 F. Supp. 222, 224 (D. Mass. 1951) (holding a debtor's solvency dispositive in awarding creditors contractual default-rate interest).

Congress; any ambiguity will be construed in favor of prior practice. *Cohen v. de la Cruz*, 523 U.S. 213, 221–22 (1998) (stating that courts should "not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure" (quoting *Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 563 (1990))); *Midlantic Nat'l Bank v. N.J. Dep't of Envt'l Prot.*, 474 U.S. 494, 501 (1986) (indicating that the "normal rule of statutory construction" that courts "follow[] with particular care" in interpreting the Code is that "if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific"); *Kelly v. Robinson*, 479 U.S. 36, 46, 53 (1986) (noting that "Congress enacted the Code in 1978 against the background of an established judicial exception . . . created in the face of a statute drafted with considerable care and specificity" and finding no "significant evidence that Congress intended to change the law"); *see also Dewsnup v. Timm*, 502 U.S. 410, 419–20 (1992) (concluding that it is "not plausible" "to attribute to Congress the intention" to act "contrary to basic bankruptcy principles" "without . . . mention[ing] [it] somewhere in the Code itself").[19]

The provisions of the 1978 Bankruptcy Code do not clear this high hurdle. As the bankruptcy court explained, "Absent *clear* Congressional intent, provisions of the Bankruptcy Code did not abrogate universally recognized legal principles under the Bankruptcy Act. Nothing . . . suggests that Congress intended to defang the solvent-debtor exception." *Ultra*, 624 B.R. at 198 (citation omitted) (emphasis added). We agree.

---

[19] We have followed the Supreme Court's lead and held similarly. *See In re Bodenheimer, Jones, Szwak, & Winchell L.L.P.*, 592 F.3d 664, 673–74 (5th Cir. 2009) (stating the rule that pre-Code bankruptcy doctrines "remain controlling unless *explicitly* superseded" (emphasis added)); *In re Laymon*, 958 F.2d 72, 74–75 (5th Cir. 1992) (similar). These precedents also bind us.

No. 21-20008

The Code's most relevant section, § 502(b)(2), tersely recodified § 63 of the preceding Chandler Act (and the 1898 Bankruptcy Act before it): It simply states that bankruptcy courts "shall allow [a] claim . . . except to the extent that," among other things, "such claim is for unmatured interest." But this affords no greater clarity than the 1898 and 1938 Acts, which similarly limited claims for interest to what "would have been recoverable at" the date the bankruptcy petition was filed—*i.e.*, matured interest. § 63, 30 Stat. at 562–63; § 63, 52 Stat. at 873;[20] *see also Ultra*, 624 B.R. at 197 ("The Bankruptcy Act's treatment of unmatured interest was nearly identical to § 502(b)(2).").

Importantly, the text of these pre-Code bankruptcy acts did not stop courts from applying the traditional solvent-debtor exception.[21] In 1911, our court was called upon to determine whether the solvent-debtor exception survived enactment of the original Bankruptcy Act of 1898. *Johnson*, 190 F. at 461. The debtors in that case, like the debtors here, were solvent. Pointing to the Bankruptcy Act's bar against claims for interest other than what "could have been recoverable" on the date the bankruptcy petition was filed, the debtors argued that they were shielded from claims for unmatured interest despite their solvency. *Id.* at 461. In rejecting the debtors' argument, we cited longstanding bankruptcy law principles to conclude that the Bankruptcy Act's bar on unmatured interest simply "was not intended to be

---

[20] The Chandler Act reenacted this provision verbatim.

[21] For this reason, this is not a case in which "the language of the Code leaves no room for clarification by pre-Code practice." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 11 (2000). This is not a case in which pre-Code practice *comported* with prior acts' text or clarified an open-ended ambiguity therein; this is a case involving a plain judicial *exception* to the prior acts. *Cf. id.* at 9–11. Because Congress was not writing upon a clean slate, we are to assume that the legislature was aware of courts' equitable exception to the prior acts' text. Had Congress intended to do away with this practice, it would have said so directly.

applied to the case of a solvent estate."[22]  *Id.* at 462.  *See also Ultra*, 624 B.R. at 196–98 (noting that this court "squarely held [in *Johnson*] that creditors of a solvent debtor may recover post-petition interest, *notwithstanding the plain text of § 63 of the Bankruptcy Act*," and that our sister circuits did likewise (emphasis added)); *supra* n.18.

The problem for the debtors in *Johnson* was not, as the dissenting opinion suggests, that the Bankruptcy Act was insufficiently explicit in its exclusion of claims for unmatured interest.  The problem was that the Bankruptcy Act was insufficiently explicit about applying this general exclusion in solvent-debtor cases.  *Cf. United States v. Texas*, 507 U.S. 529, 534 (1993) ("In order to abrogate a common law principle, the statute must 'speak directly' to the question addressed by the common law."(citation omitted)).  That is why *Johnson* held that the traditional rule would continue to apply absent an "express provision . . . allowing interest that accrues after the filing of the petition to be paid out of a surplus . . . to the bankrupt."  190 F. at 463.  The Bankruptcy Code, like its predecessors, did not give us that.

Ultra complains that this manner of statutory interpretation, which allows judicial practice to override otherwise clear statutory text, is taken from a "time capsule."  But as the Creditor Committee Appellees have pointed out, this mode of statutory interpretation is alive and well.  Indeed, the Supreme Court very recently applied an analogous interpretive approach in the patent law context.  *See Minerva Surgical, Inc. v. Hologic, Inc.*, 141 S. Ct. 2298, 2307–08 (2021) (noting that the Patent Act of 1952 has "similar

---

[22] Discussing *Johnson*, the bankruptcy court persuasively observed that unchanged "[e]quitable considerations support the solvent-debtor exception." *Ultra*, 624 B.R. at 198. "There is no reason why Congress would allow solvent debtors to wield bankruptcy as a sword to slash valid debts"—an "observation [that] applies as persuasively to Congress['s] deliberation of the Bankruptcy Code as it did to deliberations of the Bankruptcy Act." *Id.* at 199.

language" to its precursor statute against which the judicial exception of assignor estoppel developed, thus suggesting that that language did not evince sufficiently plain Congressional intent to abrogate the doctrine). We are at no greater liberty to disregard the Supreme Court's instructions in the bankruptcy context than we are in the patent domain. We remain bound by the substantive canon of Bankruptcy Code interpretation embraced in *Cohen*, *Midlantic*, and *Kelly*.

Congress has not explicitly addressed claims for unmatured interest owed by solvent debtors. Nonetheless, statutory language may carry crucial context. *See generally* Antonin Scalia, *Common-Law Courts in a Civil-Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws, in* A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 3, 24 (new ed. 2018) (explaining why "the good textualist is not a literalist"). And here, that context is the backdrop of traditional bankruptcy practice. The Supreme Court has dictated that we presume Congress did not mean to abrogate traditional bankruptcy practice "absent a clear indication that Congress intended such a departure." *Cohen*, 523 U.S. at 221. Considered in the context of what came before, the text of § 502(b)(2) hardly constitutes an unambiguous—let alone explicit—change in bankruptcy practice.[23] *See Dewsnup*, 502 U.S. at 419–20; *Bodenheimer*, 592 F.3d at 673–

---

[23] Ultra also argues that the Code's reticulated scheme already contemplates solvent-debtor scenarios but declines to embrace the full scope of the traditional solvent-debtor exception. This, we are told, gives rise to the negative implication that Congress did not intend the broad solvent-debtor exception to survive the Code's enactment. Specifically, because the Code provides that impaired creditors of solvent debtors are to receive interest at least "at the legal rate" under the best-interests-of-creditors test, *see* 11 U.S.C. §§ 726(a)(5), 1129(a)(7)(A)(ii), we are to infer that Congress intended to abrogate the traditional solvent-debtor exception and replace it with a narrower version that requires payment of post-petition interest only at the Federal Judgment Rate. Thus, Ultra tells us, we should not overstep Congress's specific instructions and apply the solvent-debtor exception to award default-rate contractual interest, despite Ultra's solvency.

74. Accordingly, we hold that the Code did not abrogate the longstanding judicial exception for cases involving solvent debtors. We thus hold that the solvent-debtor exception is alive and well. The 1978 Code's disallowance of unmatured interest did not abrogate the exception with "unmistakable" clarity. *Cohen*, 523 U.S. at 221–22. Because Ultra was solvent—indeed, "massively" solvent—the solvent-debtor exception plainly applies in this case. For that reason, Ultra must pay Creditors the contractual Make-Whole Amount—even though, as we have already determined, *see supra* section II.A., it is indeed otherwise disallowed unmatured interest.

## C.

We are not done quite yet. We have determined that the Make-Whole Amount is unmatured interest, and therefore, that it is disallowed under the Code. We have also determined, however, that the solvent-debtor exception survived the Code's enactment and applies to this case. But the solvent-debtor exception *only* ensures that solvent debtors make good on their *valid* contractual obligations. So Ultra argues, in the alternative, that the Make-Whole Amount is an unenforceable penalty under governing state law. If that were so, the Bankruptcy Code would still disallow it—the solvent-debtor exception notwithstanding. We conclude, though, that the Make-Whole Amount constitutes enforceable liquidated damages under New York law.

---

We are not persuaded. Sections 726(a)(5) and 1129(a)(7)(A)(ii) do not *unambiguously* abrogate or constrict the traditional solvent-debtor exception. Indeed, authorizing "[post-petition] interest at the legal rate . . . *on any claim*" in solvent-debtor cases does not constitute any sort of exception to the Code's disallowance of "unmatured interest" as *part of a claim*, *see id.* § 726(a)(5) (emphasis added), § 502(b)(2), so those provisions cannot be said to supplant the traditional solvent-debtor exception. If anything, § 726(a)(5) arguably *expands* the scope of the traditional English solvent-debtor exception, which seems to have allowed for ongoing interest just *as part of* (rather than "on") creditors' claims in solvent-debtor scenarios. *See, e.g.*, *Rooke*, 26 Eng. Rep. at 157; *Marlar*, 26 Eng. Rep. at 98; *supra* n.13 and accompanying text.

Therefore, the solvent-debtor exception continues to apply, and Ultra must keep its contractual promise.

Section 502(b)(1) of the Bankruptcy Code disallows "claim[s] [that are] unenforceable against the debtor . . . under any agreement or applicable law." The MNPA is governed by New York law. If New York law would prohibit enforcement of the Make-Whole Amount as an unenforceable penalty, the Code would not allow it as a claim, and the solvent-debtor exception could not resuscitate it.

We turn then to New York contract law. As the "party seeking to avoid liquidated damages," Ultra bears the burden of showing that the Make-Whole Amount is "in fact, a penalty." *JMD Holding Corp. v. Cong. Fin. Corp.*, 828 N.E.2d 604, 609 (N.Y. 2005). To do so, Ultra must show that the "amount fixed is plainly or grossly disproportionate to the probable loss" incurred by Noteholder Creditors as a result of default. *Id.* (quoting *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 361 N.E.2d 1015, 1018 (N.Y. 1977)). Showing that the Make-Whole Amount effectively grants double recovery would meet that test under New York law. *See, e.g.*, *172 Van Duzer Realty Corp. v. Globe Alumni Student Assistance Ass'n Inc.*, 25 N.E.3d 952, 957 (N.Y. 2014).

Ultra asserts the Make-Whole Amount to be unreasonably disproportionate and thus an unenforceable penalty because it allows for double recovery. The alleged double recovery stems from the fact that the MNPA "allows the Noteholders to charge ongoing interest on the accelerated principal at a 'default' rate." Brief for Appellants at 34. Since Creditors already get contractual interest on the accelerated principal, the argument goes, the Make-Whole Amount, which compensates Noteholder Creditors for the future interest payments that would have been made on the *same* accelerated principal, gives Creditors double recovery.

No. 21-20008

This argument withers under scrutiny. The Make-Whole Amount and the post-petition interest address two different harms. *Ultra*, 575 B.R. at 370–71.[24] The Make-Whole Amount serves as liquidated damages for Ultra's breach; the post-petition interest compensates for Ultra's lag in paying the accelerated principal (and the Make-Whole itself), which were already due and payable for the duration of the bankruptcy. Separate harms warrant separate recoveries; accordingly, the Make-Whole Amount is not unenforceable on this theory.

Absent any other alternative theory to show that the Make-Whole Amount is unreasonably disproportionate, Ultra fails to meet its burden. *JMD Holding*, 828 N.E.2d at 609. The Make-Whole Amount is enforceable under New York law; therefore, § 502(b)(1) does not stand in the way of the solvent-debtor exception.

## D.

We turn, finally, to post-petition interest. Ultra concedes that Creditors are entitled to *some* post-petition interest on their claims to compensate for the duration of the bankruptcy proceedings. But Ultra insists that the appropriate rate is the Federal Judgment Rate specified at 28 U.S.C. § 1961(a)—not the parties' much higher contractual default rate.[25] And Ultra reiterates that the solvent-debtor exception does not apply to suspend that rule's application here. We conclude that the contractual default rate is appropriate here.

---

[24] The bankruptcy court's first opinion in this case also provides a nice illustration that mathematically demonstrates how charging default-rate interest on the unpaid Make-Whole Amount does not result in any double recovery. *Ultra*, 575 B.R. at 371–72.

[25] Recall that the difference is rather material: the applicable Federal Judgment Rate would be only 54 basis points; the contractual default rate, meanwhile, would be *the greater* of 2% *over* either of two benchmark rates. *See supra* note 2.

29

Ultra recognizes, as it must, that unsecured creditors of solvent debtors are entitled to post-petition interest on their claims if they are to be deemed unimpaired. *See In re New Valley Corp.*, 168 B.R. 73, 81 (Bankr. D.N.J. 1994) (holding that "a solvent debtor is not required to pay postpetition interest on claims of unsecured creditors who are unimpaired"); Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 213(d), 108 Stat. 4106, 4125–26 (overruling *New Valley* by repealing 11 U.S.C. § 1124(3) (1988), and, in effect, requiring payment of post-petition interest in order for unsecured creditors to be unimpaired); *see also In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197, 205–07 (3d Cir. 2003) (recognizing and explaining *New Valley*'s statutory abrogation). Ultra asserts, though, that post-petition interest is to be calculated at the Federal Judgment Rate, "no more and no less." Brief for Appellants at 43.

Ultra's argument depends on a series of statutory inferences. For a plan to be confirmed, creditors must either be unimpaired (and therefore "conclusively presumed to have accepted the plan," 11 U.S.C. § 1126(f)), or impaired but either (1) voting in favor of the plan, *see id.* § 1129(a)(7)(A)(i), or (2) no worse off than they would be in a chapter 7 liquidation, *see id.* § 1129(a)(7)(A)(ii). Creditors are presumed "impaired under a plan unless . . . the plan leaves unaltered the[ir] legal, equitable, and contractual rights." *Id.* § 1124(1). If, therefore, creditors are deemed "unimpaired," § 1124 necessarily requires that their "legal, equitable, and contractual rights" remain "unaltered." And per Congress's statutory overruling of *New Valley* noted above, that entails provision for post-petition interest.

The question remains: how much? As to *unimpaired* creditors, the Code does not itself say. So Ultra turns to what it says about *impaired* creditors. It is reasonable, after all, to infer that creditors who are *unimpaired* (as Creditors here are stipulated to be) cannot be treated any worse than *impaired* creditors, who at least get to vote on the plan.

No. 21-20008

The Code provides that a bankruptcy court can "cram down" a plan on impaired creditors, over their objection, if they "will receive or retain under the plan . . . not less than the amount that [they] would so receive or retain if the debtor were liquidated under chapter 7." *Id.* § 1129(a)(7)(A)(ii). In turn, what the creditors would get if the debtor were liquidated is specified in § 726(a). Section 726(a) provides a waterfall for the distribution of a debtor's assets in a Chapter 7 liquidation. Before a solvent debtor's equity holders get any of the estate's leftovers, § 726(a)(5) says that creditors are to be paid interest on their claims "at the legal rate" from the petition date.

Ultra hangs its hat on these words. The "legal rate," it insists, must be the Federal Judgment Rate. Ultra cites and deploys many of the same arguments propounded in a Ninth Circuit case, *In re Cardelucci*, 285 F.3d 1231 (9th Cir. 2002). For instance, the definite article "the" that precedes "legal rate" in § 726(a)(5) indicates that the rate is singular and not variable—and the only reasonable single rate under federal law is the Federal Judgment Rate. *Id.* at 1234. And, as our sister circuit suggests, "the commonly understood meaning of 'at the legal rate' at the time the Bankruptcy Code was enacted was a rate fixed by statute"—and the Federal Judgment Rate is the most likely candidate. *Id.* at 1234–35. This conclusion, Ultra and the *Cardelucci* court continue, advances the bankruptcy system's interests in "ensur[ing] equitable treatment of creditors" by compensating them all at the same rate for the same duration of bankruptcy proceedings, and, happily, it is eminently administrable. *Id.* at 1235–36.[26]

---

[26] Still, one might well wonder why Congress did not simply cross-reference the statutory provision designating the Federal Judgment Rate, 28 U.S.C. § 1961, if indeed it meant for that to be that single rate applied. Indeed, in antitrust legislation passed just a few years after the Bankruptcy Code's enactment, Congress did just that. *See* Pub. L. No. 98-462, § 4(a), 98 Stat. 1815 (1984) (providing for "interest calculated at the rate specified in section 1961 of title 28, United States Code"); *see also, e.g.*, 28 U.S.C. § 2412(f)

No. 21-20008

We do not quarrel with the *Cardelucci* court's sensible reasoning, but neither must we decide the matter. The precise referent of "the legal rate" is not dispositive here. Why? Because Ultra overlooks the logically prior textual fact that "the legal rate" only sets a *floor*—not a ceiling—for what an impaired (and by implication, unimpaired) creditor is to receive in a cram-down scenario. Specifically, the Code provides that objecting, impaired creditors must receive "*not less* than" what they would receive in a Chapter 7 liquidation—including "interest at the legal rate" per § 726(a)(5)—in order for the plan to be "crammed down" on them. *See id.* § 1129(a)(7)(A)(ii) (emphasis added).

So, even if "the legal rate" is the Federal Judgment Rate, the Code does not preclude unimpaired creditors from receiving default-rate post-petition interest in excess of the Federal Judgment Rate in solvent-debtor Chapter 11 cases. *See* Shelley & Noh, *supra* note 16, at 368–69 (arguing that "§ 1129(a)(7) should not be interpreted to *require* the application of the federal judgment rate" and that "the fair and equitable test [of § 1129(b)] will, in many instances, permit the payment of interest at a higher rate, particularly when the higher rate is set forth in a contract"). Recall that under § 1124(1), *unimpaired* creditors' "legal, equitable, and contractual rights" must remain "unaltered." And as a matter of equity, creditors are entitled to contractually specified rates of interest "on" their claims when a solvent debtor is fully capable of paying up.[27] As the bankruptcy court rightly

---

("[I]nterest shall be computed at the rate determined under section 1961(a) of this title . . . ."); 15 U.S.C. § 4303(a)–(c) (similar).

[27] This is consistent with our prior holding that the Code's disallowance provisions do not operate to "impair" creditors. *Ultra*, 943 F.3d at 765. Section 502(b)(2) operates to disallow "unmatured interest" that is *part of* a claim—not interest *on* a claim, which is what the contractual default rates here specify. A broader reading of § 502(b)(2) to disallow *all* post-petition interest, whether as *part of* a claim or *on* a claim, would plainly

noted below, "[t]his equitable right is the root of the solvent-debtor exception." *Ultra*, 624 B.R. at 203.[28]  And as we have explained, the solvent-debtor exception survived the Bankruptcy Code's enactment.  *See supra* Section II.B.

The requirements of § 1129(b) for plan confirmation buttress our conclusion.  That section states that the bankruptcy court shall only confirm a plan if it is "fair and equitable"—a test long understood to mean the "absolute priority rule."  *See* 11 U.S.C. § 1129(b)(2)(B)(ii); *In re Linn Energy, L.L.C.*, 936 F.3d 334, 341 n.1 (5th Cir. 2019) ("The absolute priority rule requires that certain classes of claimants be paid in full before any member of a subordinate class is paid." (quoting *In re Seaquest Diving, LP*, 579 F.3d 411, 420 n.5 (5th Cir. 2009))).  As the bankruptcy court explained well, unsecured creditors vying against each other for shares of a "limited pot of assets" have no equitable rights vis-à-vis each other to contractual rates of interest on their claims: they must be treated equally; but "[w]hen the struggle is between creditors *and equity holders*, as opposed to creditors and creditors, [creditors'] equitable right [to contractual post-petition interest rates] is critical."  *Ultra*, 624 B.R. at 203 (emphasis added).  And per the absolute priority rule, creditors' rights prevail.

## III.

To sum up, Ultra is right about one thing: Creditors' Make-Whole Amount is disallowed "unmatured interest" under the Bankruptcy Code. But the traditional solvent-debtor exception compels payment of the Make-

---

conflict with § 1129(a)(7)(A)(ii) and § 726(a)(5), which expressly operate to *allow* post-petition interest *on* claims.

[28] *See also Ultra*, 624 B.R. at 203 ("The solvent-debtor exception has existed throughout the history of bankruptcy law and § 1124 provides a means to implement the exception within the plan confirmation framework of the Bankruptcy Code.").

No. 21-20008

Whole Amount because it is a valid contractual debt under applicable state law. For similar reasons, Ultra cannot avoid payment of contractual default-rate interest in favor of the much-lower Federal Judgment Rate: Creditors are entitled to what they bargained for with this solvent debtor, and the Code does not preclude the contractual interest rate. The judgment of the bankruptcy court is AFFIRMED.

No. 21-20008

Andrew S. Oldham, *Circuit Judge*, dissenting:

The majority correctly concludes that the Make-Whole Amount is unmatured interest in disguise. And it acknowledges that the Bankruptcy Code bars all unmatured interest. *See* 11 U.S.C. § 502(b)(2). In my view, it necessarily follows that the Code bars the Make-Whole Amount.

The majority nevertheless holds that an unwritten solvent-debtor exception "operates in this case to suspend § 502(b)(2)'s disallowance of [the] Make-Whole Amount." *Ante*, at 17. I recognize that the majority is attempting to faithfully apply confusing Supreme Court precedent in a difficult case. But the clear statutory text governing this issue compels me to respectfully dissent.

## I.

In my view, the solvent-debtor exception didn't survive the adoption of the Bankruptcy Code. Premise one: If it's "unmistakably clear" that a Code provision is incompatible with a prior bankruptcy practice, then the Code overrides that prior practice.[1] *Cohen v. de la Cruz*, 523 U.S. 213, 221–22 (1998); *see also ante*, at 23 (collecting cases). Premise two: It's unmistakably clear that 11 U.S.C. § 502(b)(2), which allows a given claim "except to the extent that . . . (2) such claim is for unmatured interest," is incompatible with the preexisting solvent-debtor exception. Conclusion: The Code overrides the solvent-debtor exception.

I take the first premise to be uncontroversial, *see ante*, at 23, but I should elaborate on the second. The Code provides that all claims for unmatured interest are disallowed. The solvent-debtor exception provides

---

[1] The other side of the coin: If the Code is *not* unmistakably clear, then the prior practice survives. *See ante*, at 23 (discussing and collecting cases). That proposition is orthogonal to my argument because, of course, I think the Code *is* unmistakably clear.

that not all claims for unmatured interest are disallowed. That's a stark contradiction. And the statutory text offers no alternative interpretation to avoid it, as the majority appears to recognize. *See ante*, at 17 ("[W]e conclude that the pre-Code doctrine concerning solvent debtors' obligations remains good law, *and the exception operates in this case to suspend § 502(b)(2)'s disallowance* of Creditors' Make-Whole Amount." (emphasis added)); *see generally id.* at 16–27 (majority's analysis, contending the statutory text isn't clear enough but not explaining what else the text could mean).

## II.

The majority nonetheless disputes the second premise, maintaining it's *not* unmistakably clear that 11 U.S.C. § 502(b)(2) is incompatible with the solvent-debtor exception. Its analysis begins with the Bankruptcy Acts of 1898 and 1938. *See ante*, at 21 (citing Bankruptcy Act of 1898, 30 Stat. 544; Bankruptcy Act of 1938, 52 Stat. 840). For reference, here's the relevant text:

> Debts of the bankrupt may be proved and allowed against his estate which are (1) a fixed liability, as evidenced by a judgment or an instrument in writing, absolutely owing at the time of the filing of the petition against him, whether then payable or not, *with any interest thereon which would have been recoverable at that date* or with a rebate of interest upon such as were not then payable and did not bear interest; (2) due as costs taxable against an involuntary bankrupt who was at the time of the filing of the petition against him plaintiff in a cause of action which would pass to the trustee and which the trustee declines to prosecute after notice; (3) founded upon a claim for taxable costs incurred in good faith by a creditor before the filing of the petition in an action to recover a provable debt; (4) founded upon an open account, or upon a contract express or implied;

and (5) founded upon provable debts reduced to judgments after the filing of the petition and before the consideration of the bankrupt's application for a discharge, less costs incurred and interests accrued after the filing of the petition and up to the time of the entry of such judgments.

. . .

A claimant shall not be entitled to collect from a bankrupt estate any greater amount than shall accrue pursuant to the provisions of this Act.

Act of 1898, §§ 63(a), 65(e), 30 Stat. at 562–63, 564 (emphasis added). The 1938 Act has almost identical wording—none of the slight differences are relevant here. *See* Act of 1938, § 63(a), 65(e), 52 Stat. at 873, 875.

The majority points to the italicized text, contending it amounts to a rather obvious bar on unmatured interest. *See ante*, at 24. At the least, the majority says, this antique unmatured-interest bar is just as clear as 11 U.S.C. § 502(b)(2)'s current bar. *See ibid.* (quoting the latter provision and saying, "this affords no greater clarity than the 1898 and 1938 Acts, which similarly limited claims for interest to what 'would have been recoverable at' the date the bankruptcy petition was filed—*i.e.*, matured interest" (citation omitted)).

The majority then cites a handful of old cases that read the 1898 and 1938 Acts not to foreclose the solvent-debtor exception. *Ante*, at 21 (collecting cases). One of the cases cited is even binding precedent in this circuit. *See Johnson v. Norris*, 190 F. 459 (5th Cir. 1911). If the old statutory bar on unmatured interest was just as clear as the Code's current bar, aren't we obligated to follow these precedents? Put differently, 11 U.S.C. § 502(b)(2) can't possibly be an "unmistakably clear" indication that

No. 21-20008

Congress wanted to deviate from courts' longstanding interpretation of the 1898 and 1938 Acts. *See Cohen*, 523 U.S. at 221–22. So goes the argument.

The problem, in my view, is that the old statutes *weren't* just as clear as 11 U.S.C. § 502(b)(2) is. It's simply not true that the 1898 and 1938 Acts precluded unmatured interest, full stop. Rather, the language quoted by the majority—"with any interest thereon which would have been recoverable at that date"—comes from a clause (which is offset by a comma) in one item in a five-item list (whose entries are separated by semicolons). *See Ante*, at 24 (quoting Act of 1898 § 63(a)(1), 30 Stat. at 562–63; Act of 1938, § 63(a)(1), 52 Stat. at 873). The quoted text therefore modifies *only* that first item, as the block quote above makes clear. That first item, in turn, concerns a specific subset of claims: "a fixed liability, as evidenced by a judgment *or an instrument in writing*, absolutely *owing at the time of the filing of the petition*." Act of 1898, § 63(a)(1), 30 Stat. at 562–63 (emphasis added); Act of 1938, § 63(a)(1), 52 Stat. at 873 (emphasis added). Contrast that with the category of claims discussed in the last listed item: "provable debts *reduced to judgments after the filing of the petition* and before the consideration of the bankrupt's application for a discharge." Act of 1898, § 63(a)(5), 30 Stat. at 563 (emphasis added); Act of 1938, § 63(a)(5), 52 Stat. at 873 (emphasis added). (The Make-Whole Amount at issue in this case, which seems never to have been reduced to judgment, is itself a good example of a debt that doesn't fit into the latter category but does fit into the former.) The upshot: Though § 63(a)(1) of the Acts expressly prohibits *some* unmatured interest, it *does not* contain a blanket bar on all unmatured interest—unlike 11 U.S.C. § 502(b)(2).

It also bears emphasis that the old § 63(a)(1) operates differently and less directly to bar unmatured interest than does § 502(b)(2). To see the old bar, we need to read § 63(a) together with § 65(e). The former gives a five-item list of allowed claims—claims upon which a creditor could recover in

bankruptcy. Act of 1898, § 63(a), 30 Stat. at 562–63 (beginning with, "[d]ebts of the bankrupt may be proved and allowed against his estate which are . . ." and going on to provide five categories of recoverable debts); Act of 1938, § 63(a), 52 Stat. at 873 (nearly identical). As we've seen, that list contains some qualifications, but it mainly serves the *positive* function of listing *what is permissible*. And the first permissible claims is "a fixed liability, as evidenced by a judgment or an instrument in writing, absolutely owing at the time of the filing of the petition against him, whether then payable or not, *with any interest thereon which would have been recoverable at that date* or with a rebate of interest upon such as were not then payable and did not bear interest." Act of 1898, § 63(a)(1), 30 Stat. at 562–63 (emphasis added); Act of 1938, § 63(a), 52 Stat. at 873 (emphasis added). Thus, claims for *matured* interest are allowed.[2]

Section 65(e) is a sort of zipper clause. It provides that "[a] claimant shall not be entitled to collect from a bankrupt estate any greater amount than shall accrue pursuant to the provisions of this Act." Act of 1898, § 65(e), 30 Stat. at 564; Act of 1938, § 65(e), 52 Stat. at 875. That provision serves the *negative* function of stipulating that every claim not listed as permissible *is not permissible*. But because § 63(a)(1) allows matured interest without allowing unmatured interest, and because no *other* provision allows unmatured interest, it follows that unmatured interest is barred by the combination and implication of §§ 63(a)(1) and 65(e).

---

[2] The clause "or with a rebate of interest upon such as were not then payable and did not bear interest" is not a standalone bar on unmatured interest. That's because its "rebate" applies only to "interest upon such [claims] *as were not then payable* and did not bear interest." (Emphasis added.) That means the rebate doesn't apply to unmatured interest on claims that *were* payable at the time of filing. That is, it could be that the *claim itself* was payable at the time of filing and yet the interest didn't mature until after filing. The rebate clause doesn't say anything about that kind of unmatured interest.

The very first of the majority's old cases, *Johnson v. Norris*, interpreted the Act of 1898 in just this way. First, our court noted that § 63(a)(1) allows claims for matured interest. *Johnson*, 190 F. at 561. Second, we pointed out that § 65(e) disallows any claims not allowed. *Ibid.* Third, we *inferred* that "[o]rdinarily, no question as to subsequently accruing interest can arise," *i.e.*, that unmatured interest is generally barred. *Ibid.* We then went on to hold that this bar didn't apply in solvent-debtor cases. *Id.* at 561–65. The important point for present purposes, however, is that the *Johnson* court *did not* (a) hold that the Acts expressly barred the unmatured interest and (b) then hold the express bar inapplicable in solvent-debtor cases. Rather, the court (a) held (correctly) that the Acts *implicitly* barred unmatured interest and (b) then held the implicit bar inapplicable in solvent-debtor cases.

So the *Johnson* court saw more ambiguity in the Acts than today's majority does. And that's doubly important because *Johnson* proved to be the seminal case on the topic. Three years after the decision, the Supreme Court reached the same conclusion, citing only two sources in support: Blackstone and *Johnson. See Am. Iron & Steel Mfg. Co. v. Seaboard Air Line Ry.*, 233 U.S. 261, 266 (1914) (explaining that the general rule against unmatured interest "did not prevent the running of interest during the Receivership; and if as a result of good fortune or good management, the estate proved sufficient to discharge the claims in full, interest as well as principal should be paid"). Three of the majority's cited cases relied on *Johnson* in similar fashion. *See Brown v. Leo*, 34 F.2d 127, 128 (2d Cir. 1929); *Littleton v. Kincaid*, 179 F.2d 848, 852 (4th Cir. 1950); *In re Magnus Harmonica Corp.*, 159 F. Supp. 778, 780 (D.N.J. 1958). This widespread reliance suggests that courts allowed the solvent-debtor exception to persist, not because they thought the exception could override an *explicit* congressional prohibition on unmatured interest, but because they thought any such prohibition was *implicit* at best under the

old Code. As the Supreme Court put it in 1949, "[t]he long-standing rule against post-bankruptcy interest thus appears *implicit* in our current Bankruptcy Act." *City of New York v. Saper*, 336 U.S. 328, 332.

If all of that sounds convoluted, that's precisely the point. The majority's argument rests on the premise that the 1898 and 1938 Acts barred unmatured interest just as clearly as does 11 U.S.C. § 502(b)(2). *See ante*, at 24. But that premise is, with deepest respect, false. The old statutes *did* bar unmatured interest—but the reader has to stitch together two separate provisions and make an inference from them to see it. The current Code, in sharp contrast, goes for the jugular by flatly disallowing "claim[s] for unmatured interest." 11 U.S.C. § 502(b)(2). The majority protests that "Congress has not explicitly addressed claims for unmatured interest owed by solvent debtors," *ante*, at 26, but I am not sure what Congress should have done to make the point more lucid short of saying, "and the solvent-debtor exception doesn't apply." Congress need not speak superfluously to speak "unmistakably." *See Cohen*, 523 U.S. at 221–22; *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 546 (1994) ("The Bankruptcy Code can of course override by implication when the implication is unambiguous.").

\*     \*     \*

We all agree that the Make-Whole Amount is unmatured interest. And we all agree that 11 U.S.C. § 502(b)(2) bars unmatured interest. I would leave it at that. The Make-Whole Amount should be barred, and the creditors should recover post-petition interest only at the federal judgment rate. Neither the solvent-debtor exception's historical pedigree nor its policy underpinnings—no matter how compelling—can overcome Congress's clear, and clearer-than-ever, command on this point.

I respectfully dissent.